A04A0132. BEA SYSTEMS, INC. v. WEBMETHODS, INC. et al.
(595 SE2d 87)

ELDRIDGE, Judge.

This is an appeal by BEA Systems, Inc., a nonparty, from the grant of an interlocutory injunction against it and Kevin Colon, then a BEA employee and a former WebMethods, Inc. employee. As a nonparty, BEA was affected and specifically enjoined by the interlocutory injunction without a finding that it acted in concert with Colon. Finding standing to appeal, legal error, and an abuse of discretion, we reverse and vacate the interlocutory injunction to the extent that it orders BEA or its employees to act or to refrain from acting based upon specific documents identified in the records as C0113-C0117, plaintiff's Exhibit 1.

On April 29, 2003, WebMethods, Inc. filed an unverified complaint seeking a temporary restraining order and injunctive relief against Colon; although the petition referred to an attached affidavit of Daniel M. Lascell or of Mr. Oberst, no such affidavit or affidavits appeared in the record either in the trial court or in this court then or

now.[1] Therefore, any alleged evidence contained in such affidavits is absent from the record.[2] See OCGA §§ 9-11-43 (b); 9-10-110; 9-11-65 (b) (1); *Finney v. Pan-American Fire &c. Co.*, 123 Ga. App. 250, 252 (3) (180 SE2d 253) (1971). Such injunction was sought in equity under OCGA § 9-5-8; although an injunction was sought, there was neither a verified complaint nor an affidavit in lieu of verification as mandated by law. See OCGA §§ 9-10-110; 9-11-11 (b); 9-11-65. The purpose for either verification or affidavit attached to a petition for injunctive relief is that the superior court must have evidence before it upon which to exercise the grant of any discretion through its extraordinary powers; therefore, the verified complaint serves as both pleading and evidence. *Harvard v. Walton*, 243 Ga. 860, 861 (1) (257 SE2d 280) (1979); *Salter v. Ashburn*, 218 Ga. 62, 66 (2) (126 SE2d 404) (1962); *Kilgore v. Paschall*, 202 Ga. 416, 419-420 (43 SE2d 520) (1947). The failure to file a verified complaint can be amended and does not subject the injunction to dismissal if it was supported by evidence; however, the unverified petition must be supported by other satisfactory proofs, i.e., affidavit, deposition, or oral testimony. *Edwards v. Edwards*, 227 Ga. 307, 308 (1) (180 SE2d 358) (1971); *Harper v. Atlanta Milling Co.*, 203 Ga. 608, 611 (2) (48 SE2d 89) (1948); *Bracewell v. Cook*, 192 Ga. 678 (2) (16 SE2d 432) (1941). Thus, some evidence introduced at the interlocutory injunction hearing must support every element necessary under OCGA § 10-1-760 et seq. to enjoin the misappropriation of trade secrets as alleged in the complaint, because of the absence of such evidence at the TRO hearing. *Avnet, Inc. v. Wyle Laboratories*, 263 Ga. 615, 617 (1) (437 SE2d 302) (1993); see also *DeGiorgio v. Megabyte Intl.*, 266 Ga. 539 (1) (468 SE2d 367) (1996).

"[S]ince these documents [(i.e., affidavits, e-mail, or exhibits)] were not made a part of the record before the trial court [at the TRO hearing], we have not considered them, nor any issue based on them." *Southern Discount Co. v. Heide*, 144 Ga. App. 481, 482 (2) (241 SE2d 599) (1978).

On June 2, 2003, the interlocutory hearing was held, and WebMethods and Colon were represented; BEA had counsel present in an observation capacity only. Lascell, Vice-President Legal Services, testified and identified various documents that constitute C0113-C0117. Plaintiff's Exhibit 1 was admitted, which was an e-mail from Colon, Regional Integration Specialist for BEA, to Jay

---

[1] On direction from this court, the clerk of this court had the Clerk of Fulton Superior Court search both the docket and its records for such affidavits, which have never been filed.

[2] At the May 2, 2003 TRO hearing, the trial court stated: "I read the two attached e-mails, the exhibits, the affidavits." In the interlocutory injunction dated June 2, 2003, the Lascell affidavit is referenced as part of the basis for the order.

Foreman, Steve Elcan, and Chet Kapoor — "subject: Confidential — [W]ebMethods info" "Distribute with care. [W]ebMethods view of BEA, plus [W]ebM Corp Pitch attached [which was found to contain trade secrets at C0113-C0117]. Also have access to industry vertical presentations & other competitive data as needed." The attachment was captioned "Web[M]ethods Confidential — internal use only BEA eWorld competitive notes." Such notes were a summarization of observations by WebMethods of BEA's eWorld customer conference held in March 2003 in Orlando, Florida, followed by BEA data and intentions about what was revealed at the conference regarding both product direction and its customer sales pitch made public at that time. This was followed by WebMethods' "analysts assessments," "competitive observations," and 18 pages of WebMethods' Power Point slides and customer pitch. Plaintiff's Exhibit 2 consisted of "BEA Integration Solutions Sales Strategies April 7, 2003 Kevin Colon," which was 11 pages of economic comparisons between WebMethods and its rivals; "EAI market view"; "license revenue growth"; "market share"; "WebMethods: eWorld observations"; "WebMethods: response to BEA claims"; "WebMethods: top 12 points vs. BEA"; and "WebMethods' win against BEA."

Plaintiff's Exhibit 9 was an April 17, 2003 internal BEA e-mail which alerted BEA employees that

A [W]ebMethods representative was in the audience at a number of product presentations held at BEA's eWorld event, and has developed a list of competitive notes that has been circulated to the [W]ebMethods sales force — the attached represents (more or less) the story [W]ebMethods is spinning in the market place. WHEN: Immediately following e-World (distributed sometime mid-late March 2003) IMPACT: These notes are intended to be used as competitive kill shots in response to WLI/WLEP 8.1 product enhancements that were unveiled at eWorld. HIGH LEVEL RESPONSE: It's interesting to note that [W]ebMethods would go to such subversive measures to undermine the significant impact the 8.1 release is expected to have on the market, especially when you consider they have stated repeatedly in their earnings calls that they don't see BEA as a threat in their integration deals. It's clear they are threatened, particularly given the recent momentum BEA has received from the media and analysts following e-World. . . . Much of what is in these notes is either misleading or completely untrue — you can expect a follow-up message within the next few days which will refute each of these points in greater detail.

Plaintiff's Exhibit 10 was an April 19, 2003 internal BEA e-mail which included the WebMethods competitive notes as well as BEA's proposed rebuttal, which rebuttal consisted of four pages. Exhibit 11 was an April 25, 2003 internal BEA e-mail suggesting that the attached marketing pitch be made to counter WebMethods' representations regarding BEA's product.[3]

Lascell testified that he is the Vice-President for Legal Services at WebMethods and has responsibility for preserving confidentiality of its trade secrets and other internal documents. Confidentiality of documents is protected by computer password access to the internal website, by training, and by placing the confidential caption on all internal information. WebMethods treats both trade secrets as well as any internal information as confidential. WebMethods considered all of the information in Exhibits 1 through 10, which Colon produced at his deposition, as trade secrets. Lascell testified that C0113 through C0117 of plaintiff's Exhibit 1 were WebMethods' trade secrets, because they contained WebMethods' views, strategies, and techniques that it did and will continue to use in competing with BEA in the marketplace, regarding BEA's eWorld competitive notes. Lascell testified, "The truth is that the means by which WebMethods competes against other companies in similar businesses is absolutely that which we consider a trade secret. . . . The strategies and techniques and plan indeed are absolutely trade secrets." Lascell testified that in March 2003, WebMethods obtained the eWorld Customer Conference information of BEA by having its employee register in his own name as a WebMethods employee, pay the fees, and take notes. Lascell testified:

> Yes [C0113 through C0117 were considered by WebMethods to be trade secret information]. In particular, the portion of the document that begins on page C-0115, that's entitled competitive observations, it is that that your Honor was just speaking of, the plan, if you will, by which WebMethods will position its products against BEA's products in the marketplace. That in particular. I suppose slightly less so but equally important, the BEA product direction, those things that we learned at the conference with regard to what BEA is doing with its product architecture and road map. Those two in particular.

He further testified that such information was for internal use only and that no employee or former employee was authorized to provide

---

[3] The interlocutory order specifically references Exhibit 1 at C0113-C0117, Exhibit 2, Exhibit 3, Exhibit 9, and Exhibit 10.

such information to a competitor. Industrial vertical presentation includes two types of information: (1) information accessible to the public on WebMethods' website; and (2) internal website information containing detailed analysis of products and strategies WebMethods used to position such products against competitors. Exhibit 2 was prepared by Colon for BEA in response to WebMethods' competitive notes. Exhibit 3 was prepared by WebMethods following the close of the quarter ending in December 2002, for internal use based on available financial data and from the Securities and Exchange Commission filings to illustrate its market share gains as compared to all competitors. Exhibit 3 was not considered by WebMethods as a trade secret although it was prepared for internal use only.

An unidentified BEA employee e-mailed Colon's e-mail with Exhibits 1 and 2 attached (C0113-C0117) to WebMethods without BEA's knowledge or consent. Such information disclosed to WebMethods that BEA now knew what WebMethods' area of interest in BEA's product line was, what WebMethods' marketing strategy to deal with BEA was, and what BEA's countermarketing strategy to WebMethods' plans was.

On March 31, 2003, Scott McGinnis, a former WebMethods employee, gave Colon, who had been an employee of BEA for more than a year and who had formerly worked for WebMethods, a CD that contained confidential information regarding WebMethods' planned competition with BEA and the corporate pitch. See C0113-C0117. McGinnis told Colon that the CD contained something of interest regarding WebMethods but did not disclose how he had obtained the materials regarding WebMethods on the CD. It was this information that WebMethods sought protection for under the Trade Secrets Act. See C0113-C0117.

As part of his employment, Colon signed a confidentiality agreement with WebMethods. When he left WebMethods, Colon returned all confidential materials in his possession.

Although the evidence does not establish whether or not McGinnis made the CD from information and materials which he had received as a WebMethods employee or which he obtained from a former or existing WebMethods employee, as former employees, both Colon and McGinnis knew that WebMethods wanted to keep all internal information confidential, because in its normal practice, WebMethods placed confidential cautions on everything. Further discovery is necessary to establish whether or not McGinnis obtained the materials through improper means or misappropriation. OCGA § 10-1-761 (1), (2). Thus, for the purposes of this appeal, it will be deemed that the CD was known by Colon to be wrongfully made from information that was misappropriated and delivered within the meaning of the Trade Secrets Act.

On June 18, 2003, the trial court entered an interlocutory injunction that provided in part:

> (2) Defendant is further ORDERED to send out an email to all BEA employees or representatives who received the March 31 or April 10th emails, which email shall state that the use and disclosure of the information contained in those emails has resulted in the imposition of an interlocutory injunction against him and shall further warn those persons not to disclose or use the materials in any manner until further notice; and (3) All employees, agents or representatives of BEA are further ENJOINED from developing any further competitive strategies against Plaintiff which are based, in whole or in part, on Plaintiff's trade secrets, identified as C-0113 through 0117 of Plaintiff's Ex. 1. This in no way bars BEA from developing competitive strategies against Plaintiff based upon public information or information derived from other sources; however, BEA must keep sufficient documentation on file to demonstrate the source of the information used in developing the competitive strategies.

In a footnote following the above holding, the trial court further held:

> In so enjoining BEA, this Court specifically notes that it does not intend to prevent competition between BEA and Plaintiff. The sole purpose of this provision is to prevent BEA from further utilizing Plaintiff's trade secrets which were improperly obtained, disclosed and used by Defendant, and this Order should not be construed beyond this.

1. BEA has been profoundly affected in competition with WebMethods by being directly enjoined from direct and indirect use of C0113-C0117, although not made a party to the injunctive action in equity. As a result of being specifically enjoined by the interlocutory order as a nonparty, BEA has standing to bring this appeal. See *Westwood Community Two Assn. v. Barbee*, 293 F3d 1332, 1337-1338 (11th Cir. 2002); *Castillo v. Cameron County, Texas*, 238 F3d 339, 349 (5th Cir. 2001) ("If an injunction extends to non-parties, they may appeal from it."); *United States v. Kirschenbaum*, 156 F3d 784, 794 (7th Cir. 1998) ("[N]on-parties who are bound by a court's equitable decrees have a right to move to have the order dissolved."); *Hilao v. Estate of Marcos*, 94 F3d 539, 544-545 (9th Cir. 1996) (holding that where an order expressly enjoins a nonparty and exposes it to liability for contempt, it has standing to appeal such order); *Rodney v. Piper Capital Mgmt.*, 71 F3d 298, 301 (8th Cir. 1995) ("A nonparty

normally has standing to appeal when it is adversely affected by an injunction.").

We have previously held that when a judgment is entered against a nonparty, that nonparty becomes a party with standing to appeal. See *Travelers Ins. Co. v. Segan*, 190 Ga. App. 66, 67 (1) (378 SE2d 367) (1989). Therefore, it follows that when an injunction is entered affecting and restraining a nonparty, it has standing to appeal such injunction.

2. The trial court abused its discretion in granting WebMethods an injunction against BEA, a nonparty and without first determining that BEA and Colon acted in concert. The trial court further abused its discretion in granting an overly broad injunction, and in enjoining BEA without affording it a right to be heard on the merits. OCGA §§ 9-11-19; 9-11-21; 9-11-65 (d). All of such judicial action was done without affording BEA with the opportunity to be heard.

The trial court denied BEA a fundamental right; the "due process of law requires a hearing as a matter of right." *City of Hawkinsville v. Clark*, 135 Ga. App. 875, 876 (219 SE2d 577) (1975). A trial court abuses its discretion by enjoining nonparties that did not have "a full and fair opportunity to litigate." *Steans v. Combined Ins. Co. of America*, 148 F3d 1266, 1271-1272 (11th Cir. 1998). Trial courts "may not grant an enforcement order or injunction so broad as to make punishable the conduct of persons who act independently and whose rights have not been adjudged according to law." *Regal Knitwear Co. v. Nat. Labor Relations Bd.*, 324 U. S. 9, 13 (65 SC 478, 89 LE 661) (1945). It is "our deep-rooted historic tradition that everyone should have his own day in court." (Citations and punctuation omitted.) *Richards v. Jefferson County, Alabama*, 517 U. S. 793, 798 (116 SC 1761, 135 LE2d 76) (1996); accord *United States v. Kirschenbaum*, supra at 792 (where a nonparty has been enjoined, "[t]he core of due process is the right to notice and a meaningful opportunity to be heard") (citation and punctuation omitted).

OCGA § 9-11-65 (d) provides, in pertinent part, that an injunction "is binding only upon the parties to the action, their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them." *The Bootery, Inc. v. Cumberland Creek Properties*, 271 Ga. 271, 272 (2) (517 SE2d 68) (1999). Absent effective representation, nonparties who are not "in active concert or participation" may not be enjoined; with effective representation, a nonparty who acts in concert with a party may be enjoined. *Zenith Radio Corp. v. Hazeltine Research*, 395 U. S. 100, 112-113 (89 SC 1562, 23 LE2d 129) (1969). BEA has not been found to be "in active concert or participation" with Colon and has not been permitted to present argument or evidence; thus, the trial court abused its discretion in specifically extending the injunction to BEA

and its employees. *The Bootery, Inc. v. Cumberland Creek Properties*, supra at 273. Further, WebMethods has fought the intervention of BEA after the injunction was entered against BEA. The injunction by the trial court and WebMethods' briefs nowhere indicate that the trial court considered whether or not Colon and BEA acted in concert for BEA to be enjoined.

On remand, the trial court must determine after hearing evidence whether BEA and Colon were in active concert or participation; absent such finding, the trial court lacked discretion to enjoin BEA, either directly or indirectly. See generally *Smith v. Mid-State Nurses*, 261 Ga. 208, 209 (403 SE2d 789) (1991).

On remand, the trial court must determine whether all or any part of C0113-C0117 documents constitute trade secrets, whether all or any portion of such information had been disclosed to third parties, causing any protection to be lost, if they are trade secrets, and whether any trade secret protection remains, if there has been a disclosure. As a competitor, BEA would have a right to use all or part of this information which did not come within the trade secret protection, either then or now. The trial court should determine whether C0113, BEA's eWorld Conference information as noted by the WebMethods' employee, was a trade secret of either BEA or WebMethods. Further, the trial court should determine if all or parts of C0114-C0117 are trade secrets, then or now, because WebMethods may have disclosed such information to clients, potential clients, analysts, or other third persons so that BEA had access to such information by proper means. However, in the injunction, the trial court put the burden on BEA not to directly or indirectly use such information in developing competitive strategies against WebMethods without determining that such information was a trade secret or remained trade secrets entitled to protection. Thus, the injunction was overly broad and an abuse of discretion, because some or all of such information may not have had trade secret protection, due to WebMethods having disclosed such information to clients or others so that BEA or other competitors could have acquired the information through proper means. See *Smith v. Mid-State Nurses*, supra at 209; *DeGiorgio v. Megabyte Intl.*, supra at 540 (3).

Thus, the direct and indirect provisions of the interlocutory injunction against BEA are reversed and vacated. On remand, the trial court should consider BEA's motion to intervene.

When the trial court rehears this case, it must also consider BEA's defense that WebMethods had unclean hands when seeking equity. On remand, the trial court must consider the defense of unclean hands as an equitable defense. A number of maxims of equity are involved with the defense of unclean hands, because the misconduct of the petitioner must be considered as well as compared

to the conduct of the respondent before equity will aid a party: "who would have equity must do equity"; and "where both parties [are] equally at fault; where fault is equal." OCGA §§ 23-1-10; 23-1-15; *Dobbs v. Dobbs*, 270 Ga. 887, 888 (1) (515 SE2d 384) (1999); *Pryor v. Pryor*, 263 Ga. 153, 154 (1) (429 SE2d 676) (1993); *Williams v. Williams*, 255 Ga. 264, 265 (336 SE2d 244) (1985).

*Judgment reversed and vacated and case remanded with directions. Ruffin, P. J., and Adams, J., concur.*

DECIDED JANUARY 28, 2004 —
RECONSIDERATION DENIED FEBRUARY 11, 2004.

*Alston & Bird, Patrick J. Flinn, Angela Payne-James, Cherri T. Gregg*, for appellant.

*Anderson & Anderson, Wade G. Anderson, King & Spalding, John F. Wymer III, Laura K. Johnson*, for appellees.