A09A1542. PARAMOUNT TAX & ACCOUNTING, LLC et al.
v. H & R BLOCK EASTERN ENTERPRISES, INC.
(683 SE2d 141)

BLACKBURN, Presiding Judge.

Paramount Tax and Accounting, LLC ("Paramount") and Mary Squire appeal from a preliminary injunction order entered against them and in favor of Squire's former employer, H & R Block Eastern Enterprises, Inc. ("Block"). Paramount and Squire assert that the trial court erred in finding: (1) that the restrictive covenants contained in Squire's employment contract with Block were enforceable; (2) that Squire had breached those covenants; and (3) that the names and addresses of Block's past customers constituted a trade secret. Paramount and Squire further claim that the trial court abused its discretion in entering an overly-broad injunction against them.

We find that the noncompetition clause contained in Squire's employment contract is invalid, because it fails to properly limit the territory to which it applies. Accordingly, the trial court erred in concluding that the restrictive covenants at issue were enforceable

---

and that Squire had breached the same. We therefore reverse those findings and that part of the trial court's order enjoining Squire from engaging in conduct that violates the invalid covenants. We affirm, however, that part of the trial court's order finding that Block's customer list constituted a trade secret, because this finding is supported by some evidence. Finally, we hold that the injunction entered against Paramount and Squire resulting from their misappropriation of this trade secret was impermissibly broad, and we therefore vacate that injunction and remand the matter to the trial court, so that it may fashion more narrowly tailored relief.

The decision to grant an interlocutory injunction rests within the sound discretion of the trial court, "and we will not disturb the trial court's order in the absence of a manifest abuse of that discretion." (Punctuation omitted.) *Trujillo v. Great Southern Equip. Sales, LLC*.[1] An abuse of discretion may be found where there is no evidence supporting the trial court's findings or where the trial court misinterpreted or misapplied the relevant law. *Azzouz v. Prime Pediatrics, P.C.*[2]

The record shows that from December 1, 2006 through April 16, 2007, Squire was employed as a tax professional at a Block office located on Thompson Bridge Road in Gainesville, which was one of eight local offices in Block's "Gainesville District." As a tax professional, Squire's job was to prepare and file tax returns for individual Block clients who patronized the Thompson Bridge office. On December 18, 2007, Block hired Squire to serve as the office manager for the Thompson Bridge office for the 2008 tax season. As the office manager, Squire did not regularly prepare tax returns, but instead managed the day-to-day-operations of the office, including scheduling. She also greeted clients, handled client issues, and was available to assist the tax professionals, if necessary. In her capacity as an office manager, Squire had access to Block's client database for the entire Gainesville District. That database included, among other things, the names and addresses of all clients whose tax returns had been prepared and filed from any of the Block offices within that district.

Squire's 2008 employment contract with Block contained post-employment restrictive covenants, including noncompetition and nonsolicitation clauses, which provided:

### 9. Post-Termination Covenants.
a) Associate covenants that during the term of this Agree-

---

[1] *Trujillo v. Great Southern Equip. Sales, LLC*, 289 Ga. App. 474, 476 (657 SE2d 581) (2008).

[2] *Azzouz v. Prime Pediatrics, P.C.*, 296 Ga. App. 602, 603 (675 SE2d 314) (2009).

ment and for two (2) years following the cessation of the associate's employment hereunder for any reason (the "Restricted Period"), Associate shall not directly or indirectly:

(1) Establish or engage in any business for the preparation or electronic filing of tax returns, or be employed (whether as an employee, independent contractor, or unpaid advisor) by any such business or organization in any management or leadership capacity or in any capacity that involves the preparation or electronic filing of tax returns. Said restriction is limited to business(es) or organizations located or conducted within, or soliciting business within, Associate's district of employment as set forth in Section 1, above, and ten (10) miles of such district's boundaries at the time of this Agreement.

(2) Solicit the Company Clients for the purpose of offering to such clients: (i) tax return preparation services; (ii) electronic filing of tax returns; or (iii) any Alternative Products or Services. . . .

c) For purposes of this Section 9, "Company Clients" is defined as every person or entity whose federal or state tax return was prepared or electronically transmitted or who received any Alternative Products or Services, within Associate's district of employment. . . . "Company Clients" is further limited to clients who were provided such services during the term of this Agreement by associates managed by Associate during the term of this Agreement.

Attached to the contract was a map which showed an outline of the Gainesville District.[3]

Squire took a company-mandated eight-week leave following the 2008 tax season, but had returned to work for Block as the Thompson Bridge office manager by July 2008. In early December 2008, however, Squire tendered her resignation to Block, telling her district manager that she was retiring to spend more time with her grandchildren, who lived out-of-state. Squire worked for approximately two more weeks after giving Block notice of her resignation, and during that time she continued to have access to the Block client database for the Gainesville District.

In early January 2009, Squire's former district manager at Block

---

[3] The map, which contained no scale, showed the city of Gainesville and the major highways surrounding that city, and it contained certain "pinpoints" that represented Block offices found in the Gainesville area. Lines connected each of the pinpoints to one another, and these lines represented the district's borders.

saw Squire pictured, together with other former Block employees, in an advertisement for Paramount. The ad referred to Paramount's "tax professionals, pictured above." Shortly thereafter, Paramount sent out a business-solicitation letter (the "solicitation") to between approximately 5,000 and 6,000 people. The solicitation, which was signed by Paramount's owner, Chris Hardy, contained a coupon for $30 off Paramount's tax preparation services, and stated, in part, "I have assembled a group of the best tax advisors in the Hall County area to serve you." The letter then outlined the "three biggest reasons" for the customer to use Paramount for tax preparation services, with the first reason being that "[y]ou have probably used our tax preparers before at another company around the block." The letter then gave the names of Paramount's "Tax Preparers," each of whom was a former Block employee, and specified the Paramount location where each individual was working.

Squire admitted hand addressing some of these letters for Paramount during late December 2008, after she left her employment with Block, but claimed that she was not paid to do so. Rather, she explained that Hardy was her investment advisor and that, after her plans to visit her grandchildren for the holidays were frustrated by scheduling conflicts and financial concerns, she volunteered to help Hardy launch his business by addressing some letters. Squire testified that she addressed the letters at one of Paramount's three offices, taking the addresses from a list provided to her by Paramount. She also testified that she helped Paramount in setting up for an "open house" at its office located on Thompson Bridge Road, by decorating and assisting with the refreshments. Although the open house was designed to solicit business, Squire denied ever working for Paramount, noting that Block had served her with the instant lawsuit on the same day as Paramount's "grand opening."

At the injunction hearing, Block introduced evidence supporting the conclusion that at least some of the addresses Paramount used for the solicitation were taken directly from the Block client database for the Gainesville District. One such letter was received by a couple living in Kansas, whose tax return was filed out of a Gainesville District office. Although the couple had never lived in Gainesville, one of their relatives was employed by Block, and the relative had prepared and filed the couple's tax return.

A Block employee at the Flowery Branch office in the Gainesville District testified that in 2008 she had filed a tax return for her then 94-year-old great aunt. At the time the return was filed, the great aunt was in the hospital, and her family was planning to move her to a nursing home. The employee, therefore, gave her own parents' address as that of the aunt, because the employee's mother had the great aunt's power-of-attorney. Paramount sent the great aunt a

solicitation at that address, even though it had never otherwise been the address of record for the woman. That same employee testified that at the time she filed her son's tax return, he was temporarily living with his grandparents, so she listed the grandparents' home address on the son's tax return. Paramount sent the son a solicitation at that address, even though it was not generally his address of record.

After learning of the solicitations, Block sued Squire, asserting claims for breach of the employment agreement, injunctive relief, and attorney fees. Block also filed a separate motion for an interlocutory injunction, seeking to immediately enjoin Squire from: (1) further breaching the noncompetition and nonsolicitation covenants found in her employment agreement; and (2) further misappropriating Block's trade secrets. Block subsequently amended its complaint to add Paramount as a defendant and to assert a claim for misappropriation of trade secrets against both Squire and Paramount. Block also filed a second motion for interlocutory injunction, seeking to enjoin Squire and Paramount from further misappropriating, using, or disclosing Block's trade secrets.

Following a hearing on Block's motions for interlocutory injunctions, the trial court entered an order granting the same, finding that: (1) the restrictive covenants contained in Squire's 2008 employment contract with Block were legal and enforceable; (2) that "Block's client database and information derived therefrom is a trade secret within the meaning of OCGA § 10-1-761 (4)"; and (3) that Squire and Paramount acted in concert to misappropriate that trade secret. The order enjoined Squire from violating the noncompete provisions of her employment contract and enjoined Paramount and its employees, independent contractors, and unpaid advisors from "solicit[ing] or perform[ing] tax preparation work (whether paid or unpaid)" for any of the approximately 16,000 entities or individuals listed in the 2008 client database for Block's Gainesville District. Paramount and Squire now appeal from that order.

1. We first address whether the trial court erred in holding that the restrictive covenants found in Squire's employment contract were enforceable. "Restrictive covenants that are ancillary to an employment contract are subject to strict scrutiny and will be voided . . . if they impose an unreasonable restraint on trade." (Punctuation omitted.) *Trujillo*, supra, 289 Ga. App. at 476 (1). Such covenants will be enforced only if, when considered in light of the business interests the employer seeks to protect and the effect the covenants have upon the employee, they are reasonable as to: (1) duration; (2) the capacity in which the employee is prohibited from competing against his former employer; and (3) the geographic territory in which the former employee is restricted from working.

*Chaichimansour v. Pets Are People Too, No. 2.*[4] "Whether the restraint imposed by the employment contract is reasonable is a question of law for determination by the court, which considers the nature and extent of the trade or business, the situation of the parties, and all the other circumstances." (Punctuation omitted.) *Habif, Arogeti & Wynne v. Baggett.*[5]

Applying these principles, we find that the restrictive covenants in Squire's employment contract are unenforceable because the noncompetition clause contained therein is overbroad. Specifically, as explained below, that clause fails to properly limit the territory to which it applies.

To be enforceable, a noncompetition clause must contain a territorial limitation sufficient to "give the employee notice of what constitutes a violation of the restrictive covenant [by] *specify[ing] with particularity the territory in which the employee['s conduct] is restricted.*" (Citation omitted; emphasis supplied.) *W. R. Grace & Co. v. Mouyal.*[6] In determining whether a noncompete clause satisfies this requirement, a court must examine the "interplay between the scope of the prohibited behavior and the territorial restriction." *Azzouz,* supra, 296 Ga. App. at 606 (1) (c). "Where the restriction is broad — for example, not limited to clients the employee served — the territorial limitation must be specified and closely tied to the [geographic] area in which the employee actually worked." (Punctuation omitted.) *Dent Wizard Intl. Corp. v. Brown.*[7] See also *Beacon Security Tech. v. Beasley*[8] ("[a] broad territorial limitation may be reasonable if the scope of prohibited behavior is sufficiently narrow"). The noncompetition clause in Squire's employment contract fails to meet this requirement, because the territorial limitation contained therein is so overbroad as to be almost nonexistent.

As set forth above, that clause (Paragraph 9 (a) (1)) prohibits Squire from working for any employer whose business includes the preparation and electronic filing of income tax returns, if that employer is located, conducts business, or solicits business in Block's Gainesville District or within ten miles of the district's borders. Thus, this clause seeks to impose a broad restriction on Squire's post-Block employment (i.e., the restriction is not limited to clients served by Squire personally), but it fails to limit the prohibited conduct to a specific geographic area. Indeed, on its face, this

---

[4] *Chaichimansour v. Pets Are People Too, No. 2,* 226 Ga. App. 69, 70 (1) (485 SE2d 248) (1997).

[5] *Habif, Arogeti & Wynne v. Baggett,* 231 Ga. App. 289, 292 (2) (498 SE2d 346) (1998).

[6] *W. R. Grace & Co. v. Mouyal,* 262 Ga. 464, 465 (2) (422 SE2d 529) (1992).

[7] *Dent Wizard Intl. Corp. v. Brown,* 272 Ga. App. 553, 556-557 (1) (612 SE2d 873) (2005).

[8] *Beacon Security Tech. v. Beasley,* 286 Ga. App. 11, 13 (648 SE2d 440) (2007).

language prevents Squire from accepting employment anywhere in the United States, if her prospective employer engages in the preparation and electronic filing of tax returns and also either has an office or advertises in, or within ten miles of, Block's Gainesville District.

Significantly, this restriction would apply even if Squire were not going to work at a location within ten miles of the district. The covenant would prohibit Squire from accepting employment, for example, at the Atlanta, Savannah, Macon, or Columbus office of a statewide tax preparation or accounting firm, if that firm also had an office in or advertised within ten miles of the Gainesville District. Similarly, assuming that one or more of Block's national competitors has offices or advertises within ten miles of the Gainesville District, this language would prevent Squire from accepting a position with such an entity, even if she were relocating out-of-state. This clause therefore overprotects Block's business interest "in the customer relationships [Squire may have] established and/or nurtured while employed" at Block, and it does so at the expense of Squire's "right to earn a living, and [her] ability to determine with certainty the area within which [her] post-employment actions are restricted." (Citation omitted.) *W. R. Grace*, supra, 262 Ga. at 466 (2).

Given its overbreadth, the noncompetition covenant contained in Squire's employment contract was unenforceable as a matter of law. See *Puritan/Churchill Chemical Co. v. Eubank*[9] ("language which restricts employees from activities in a much more limited fashion than is necessary for the protection of the employer will not withstand the reasonableness test so as to uphold the covenant"); *Stultz v. Safety & Compliance Mgmt.*;[10] *Dent Wizard*, supra, 272 Ga. App. at 556-557 (1). "Because the [noncompetition] clause was unenforceable, the [nonsolicitation] clause included in the agreement was likewise unenforceable. In restrictive covenant cases strictly scrutinized as employment contracts, Georgia does not employ the 'blue pencil' doctrine of severability." *Trujillo*, supra, 289 Ga. App. at 478 (2). See also *Advance Tech. Consultants v. RoadTrac*[11] ("regardless of whether they are individually or collectively categorized as nonsolicit or noncompete covenants, Georgia law is clear that if one of them is unenforceable, then they are all unenforceable"). We therefore reverse those parts of the trial court's order finding that the restrictive covenants in Squire's employment contract were enforceable and that she had violated those covenants.

---

[9] *Puritan/Churchill Chemical Co. v. Eubank*, 245 Ga. 334, 335 (265 SE2d 16) (1980).

[10] *Stultz v. Safety & Compliance Mgmt.*, 285 Ga. App. 799, 804 (648 SE2d 129) (2007).

[11] *Advance Tech. Consultants v. RoadTrac*, 250 Ga. App. 317, 320 (2) (551 SE2d 735) (2001).

We also reverse that part of the order enjoining Squire from engaging in conduct which would violate the invalid covenants.

2. Paramount and Squire next argue that the trial court erred in concluding that Block's customer database constituted a trade secret. We disagree, because the trial court's holding was supported by both the relevant law and the evidence.

"To be protected as a trade secret, a customer list must (1) derive economic value from being a secret not readily ascertainable by proper means, and (2) be the subject of reasonable efforts to maintain its secrecy." *Vito v. Inman.*[12] See also OCGA § 10-1-761 (4). Paramount and Squire argue that names and addresses of Block's clients do not qualify as a trade secret, because such information could be easily determined by looking in a telephone directory. This argument is without merit. While many names and addresses are readily available from a phone book, the fact that certain individuals listed therein have previously used Block for tax preparation services is not. "Obviously, there are innumerable other proper sources from which [Paramount] might derive a general list of *potential* customers. . . . However, the only logical source from which [Paramount and Squire] might secure lists containing specific information regarding the *actual* customers" of Block's Gainesville District is the business records of Block, including its client database. (Emphasis in original.) *Avnet, Inc. v. Wyle Labs*[13] (holding that lists containing the identities of, and specific information concerning, an employer's actual customers are considered a trade secret where the employer "ha[s] made a reasonable effort to maintain the secrecy of the customer lists").

Additionally, despite Paramount and Squire's argument to the contrary, "[a] review of the record reveals evidence from which the trial court could have found that [Block] had made . . . a reasonable effort to maintain the secrecy of [its] customer [database]." *DeGiorgio v. Megabyte Intl.*[14] That evidence included testimony that Block did not publish its client list, had established company-wide policies to protect that information from disclosure to third parties, and had counseled its employees regarding those policies. Block also limited access to its customer database to certain employees and the information was password protected. Furthermore, even those employees allowed to access the database were not allowed to print out information therefrom or to take such information home with them.

In light of this evidence, the trial court did not err in finding that

---

[12] *Vito v. Inman*, 286 Ga. App. 646, 649-650 (2) (649 SE2d 753) (2007).
[13] *Avnet, Inc. v. Wyle Labs.*, 263 Ga. 615, 616-617 (1) (437 SE2d 302) (1993).
[14] *DeGiorgio v. Megabyte Intl.*, 266 Ga. 539, 540 (2) (468 SE2d 367) (1996).

the information contained in Block's client database, including the names and addresses of its clients, constituted a trade secret. Id. See also *Avnet*, supra, 263 Ga. at 617 (1). We therefore affirm the trial court's order in this regard.

3. Paramount and Squire do not challenge the trial court's finding that they acted in concert to misappropriate information from the Block client database. They argue, however, that the injunctive relief granted to Block based on this finding was so overbroad that it constituted an abuse of discretion. We agree.

Paramount could not use the trade secret information it misappropriated from Block to solicit clients. See OCGA §§ 10-1-762 (a); 10-1-763. Moreover, because Paramount could not benefit from its misappropriation of a competitor's trade secrets, it could not work for clients who came to Paramount as a result of its use of the misappropriated information. Id. See also *Essex Group v. Southwire Co.*[15] Paramount's misappropriation of trade secret information, however, did not automatically bar it from working for any former Block client in the Gainesville District. This is because Block's trade secrets claim did not entitle it to protection from having to compete with former employees who now worked for Paramount. See *Allen v. Hub Cap Heaven*[16] ("[u]tilization of [a former employee's] personal knowledge may be forbidden through the use of restrictive covenants, but not under the Trade Secrets Act") (citation and punctuation omitted); *Kitfield v. Henderson, Black & Greene*[17] ("any personal or subjective knowledge or other skills gained by [the employee] while working . . . do not come under the Trade Secrets Act and their use may be prohibited only through restrictive covenants in an employment contract"). Thus, Paramount was entitled to perform services for former Block clients if those clients did not come to Paramount as a result of its use of misappropriated trade secret information — i.e., it could work for those former Block clients who came to Paramount because of general advertising, location, pricing, or convenience. It could also work for former Block clients who had learned, *by some means other than a solicitation based upon Block's trade secret information*, that their regular tax preparer now worked for Paramount.

As noted above, however, the injunction entered by the trial court prohibits Paramount or its employees from performing even unpaid tax preparation work for any of the approximately 16,000 entities and individuals whose names appeared in the Block client

---

[15] *Essex Group v. Southwire Co.*, 269 Ga. 553, 556 (1) (b) (501 SE2d 501) (1998).

[16] *Allen v. Hub Cap Heaven*, 225 Ga. App. 533, 536 (3) (b) (484 SE2d 259) (1997).

[17] *Kitfield v. Henderson, Black & Greene*, 231 Ga. App. 130, 135 (5) (498 SE2d 537) (1998).

database for the Gainesville District. This injunction afforded Block far broader relief than it was entitled to, and therefore constituted an abuse of the trial court's discretion.[18] See *BEA Systems v. Webmethods, Inc.*[19]

The trial court's rationale for entering so broad an injunction was based on Chris Hardy's testimony at the injunction hearing, that Paramount no longer had the lists of names and addresses it used to send out the solicitation. In light of Paramount's claimed inability to produce these lists, we agree that Block was entitled to the presumption that any former Block client who received the solicitation did so as a result of Paramount's misappropriation of its trade secret information. Thus, Paramount could be enjoined from performing services for former Block clients who came to it as a result of the January 2009 solicitation. The trial court erred, however, in assuming that in the absence of the lists used to send out the solicitation, there was no way to determine whether a former Block client was coming to Paramount as a result of the same. The record, in fact, shows that there were ways of making that determination.

The evidence showed that the solicitation contained two coupons — one for the addressee and one for the addressee to give to a friend. Chris Hardy testified that Paramount had distributed several coupons, but that each coupon had its own code. When a customer came in with a coupon, Paramount entered that fact into its computer, together with the appropriate coupon code. Accordingly, the trial court could enjoin Paramount from working for any former Block client who came in with a coupon from the solicitation.

The record also contained approximately 71 individual client surveys of Paramount customers. The survey asked the client's name, if the client had used a professional tax preparation service the previous year and, if so, the name of that service. The survey asked how the client had heard about Paramount, and listed the following options, asking the client to check one: "radio, newspaper, letter dated January 2009, website, tv, flyer, drove by and saw us, and other (please explain)."[20] The trial court could therefore enjoin

---

[18] The overbreadth of the trial court's order is demonstrated by the testimony showing that Block employees were allowed to prepare, at no cost, tax returns for up to five friends or family members. Those friends and family members appeared in the Block client database, along with the names of those Block employees who had filed their own tax returns through a Block office. Under the terms of the trial court's order, therefore, the former Block employees working for Paramount could not even prepare their own tax returns, much less those of their friends and family members.

[19] *BEA Systems, Inc. v. Webmethods, Inc.*, 265 Ga. App. 503, 510 (2) (595 SE2d 87) (2004).

[20] Of the 71 clients surveyed, 67 had been a Block client the previous year, and 15 of those indicated that they had learned of Paramount through a January 2009 letter, with the remainder stating they had learned of Paramount through the newspaper (13 clients), a flyer

Paramount from working for any former Block client who admitted coming to Paramount as a result of a January 2009 letter.

As the foregoing demonstrates, the injunction entered by the trial court granted Block protection from competition — protection to which it was not entitled under the Trade Secrets Act. Moreover, it was possible for the trial court to fashion more narrow relief that still protected Block's trade secrets rights while also protecting the rights of Paramount and its employees, as well as "the public's ability to choose the professional services it prefers." *Beacon Security Tech.*, supra, 286 Ga. App. at 13. We therefore vacate that portion of the trial court's order enjoining Paramount and its employees from generally soliciting or performing tax preparation work for any Block client listed in the 2008 client database for the Gainesville District. The case is remanded to the trial court for the entry of a new order consistent with this opinion.

*Judgment affirmed in part, reversed in part, and vacated and remanded in part. Adams and Doyle, JJ., concur.*

DECIDED AUGUST 6, 2009.

*Stewart, Melvin & Frost, Mark W. Alexander, Jennifer I. Robertson,* for appellants.

*Balch & Bingham, J. Matthew Maguire, Jr., Robert F. Glass,* for appellee.

---

(10 clients), the website (1 client), or by driving by a Paramount office (3 clients) or through other means (25 clients). Of the 25 former Block clients who responded "other," 12 indicated they had learned of Paramount either through or because of a relationship (familial or otherwise) with the person preparing their taxes. The remaining 13 indicated they were referred by friends, family, or co-workers.