## A10A0916. WOMACK v. OASIS GOODTIME EMPORIUM I, INC. et al.
### (705 SE2d 199)

BARNES, Presiding Judge.

Tina L. Womack was a dancer at Oasis Goodtime Emporium I, Inc., an adult entertainment establishment, when a customer

---

assaulted her in a private room. She sued Oasis, contending that it breached its duty to her as an invitee to keep its premises safe, and sued John Doe for assault and false imprisonment. In response to Oasis's motion for summary judgment, Womack asserted that the attack was foreseeable and would have been prevented if the club had complied with certain DeKalb County ordinances relating to adult entertainment clubs. The trial court granted Oasis's motion, finding among other things no evidence that Oasis was subject to the county ordinances. Because Womack was not required to submit evidence about issues Oasis never raised, and because genuine issues of material fact exist in this case for a jury to decide, we reverse.

To prevail at summary judgment, the moving party must demonstrate that there is no genuine issue of material fact and that the undisputed facts, viewed in the light most favorable to the nonmoving party, warrant judgment as a matter of law. OCGA § 9-11-56 (c). "A defendant may do this by showing the court that the documents, affidavits, depositions and other evidence in the record reveal that there is no evidence sufficient to create a jury issue on at least one essential element of plaintiff's case." *Lau's Corp. v. Haskins*, 261 Ga. 491 (1) (405 SE2d 474) (1991). If the defendant points out that no evidence supports an element necessary to the plaintiff's case, then the burden shifts to the nonmoving party to "point to specific evidence giving rise to a triable issue." Id. But the plaintiff does not bear the burden on summary judgment of introducing evidence to support each essential element in her case unless and until the defendant points to the absence of such an element and the burden shifts. When reviewing the grant or denial of a motion for summary judgment, this court conducts a de novo review of the law and the evidence, viewing the facts favorably to the respondent. *Wachovia Bank v. Moody Bible Inst. of Chicago*, 283 Ga. App. 488, 489 (642 SE2d 118) (2007).

In this case, viewed favorably toward Womack as the respondent to the summary judgment motion, the evidence shows that patron John Doe assaulted Womack in one of the club's unmonitored private rooms. Doe, who was 6'3" and 200 pounds, paid Womack to accompany him to a "VIP room," which was intended for private conversation and dancing. Doe also paid the VIP bouncer directly for the room rental, and the bouncer placed Doe and Womack in a room at the end of the hall. Another man who was Doe's associate also hired a dancer, and the couple entered the VIP room with Doe and Womack. Unlike other clubs with windows in their private rooms which were monitored by bouncers, the VIP rooms in Oasis were windowless and the doors were covered with curtains. Further, while the club had surveillance cameras on the main floor, in the dressing room, and inside and outside the front door, there were no cameras

in the VIP rooms. The two dancers spent an hour and a half in the room with the two men.

Womack explained that adult entertainment club rules about physical contact were that the dancer was not supposed to touch the customer "within reason," and the customers were never supposed to touch the dancers, although Oasis did not "crack down" on the rules and allowed customers to touch the dancers on their shoulders or knees. When asked where the club "drew the line," she replied, "[At] Oasis, unlike a lot of clubs, it takes a lot for them to draw the line there. I don't see them throw many people out for anything." For example, some of the dancers performed full contact table dances, sitting on the customers' laps and straddling them, as did the "shooter girls," who walked around selling shots to the customers. The dancers were allowed to drink as much as they wanted as long as they could stand.

Womack also testified that at most clubs, if a dancer complained to a bouncer about a customer's behavior, the customer would normally be banned from the club permanently. While describing how bouncers at another club handled aggressive customers, Womack said the "bouncers patrol their VIP rooms. We have windows and they walk by every five minutes and look into every single room. If they see a guy doing anything, trying to do anything, they handle the situation immediately." When asked if the bouncers at Oasis normally came into the VIP rooms, Womack responded, "Come in a room, no. They usually check, make sure they don't hear anything. Oasis is different than a lot of clubs. They have curtains and they don't have . . . windows [in the private rooms]." People inside the rooms could see shadows from people passing by but people outside the room could not see in.

The VIP rooms were intended for private conversation and dancing, and while sometimes the dancers had more physical contact with the customers than they did on the main floor, the customers were not allowed to "grope" the dancers and the dancers did not "feel[ ] on" the customers. Womack explained that the dancers try to keep the customers interested, "but there's a line. You can only take it so far before you go over the line. Once you're at your limit, that's all you can do."

Toward the end of the session, Doe "started getting just a little anxious" and asked Womack to "do more," although he never specified what "more" was. After the waitress appeared briefly to say their time was up, Doe stood as Womack and the other dancer got dressed. Doe asked Womack for some of his money back because she did not do "what he thought [she was] going to do." She told him she did not give refunds, and he replied, "Bitch, you're going to give me my money back." Doe reached for Womack's garter where she kept

YALE LAW LIBRARY

her money, and when she reached down to cover it Doe began "yelling and cussing at [her] and just punched [her] in the face." She slid to the floor with her back to the wall and Doe hit her with both fists five or six times in the face and head, leaving her with a swollen black eye and a swollen bloody nose. She estimated that two seconds passed between the time he demanded his money back and he first hit her, although she was not asked how much time passed between when Doe began getting anxious for her to "do more" and when he began to hit her in the face.

The other dancer slipped past Doe out the door and retrieved the bouncer, who came in while Doe was still hitting Womack and said, "Hey, what's going on?" He quickly walked Doe and the other man out of the room, and they were never seen again.

Womack did not make a police report that night, although she spoke to the police briefly. Before she did so, the night manager told her the police were at the club but that he had already talked to them and they "didn't care. . . . [The police] said, you know, . . . what would you expect. She's a stripper or something like that. . . . And [the manager] told me not to make a police report, that he would call his friend that he knew was a cop and he would come handle everything." Womack asked the manager what had happened to Doe and the other man, and he replied, "Oh, they ran off." After Womack talked to the night manager, she talked to the police, who asked if she wanted to make a report. She replied that she did not. When asked at her deposition if the responding police officers had acted "like jerks" when they talked to her that night, she replied that they did not talk much, so she could not say they were jerks, but she could not say they were very sympathetic either. Shortly after she returned to work a few days later, the manager's police friend came to Oasis and questioned Womack, but apparently made no official report or follow-up.

Oasis argued in its motion for summary judgment and on appeal that it had no duty to prevent an assault motivated by personal malice, and that Womack "admits" the assault against her was unforeseeable because it was so sudden and unexpected it could not have been prevented. Actually, Oasis's condensation of Womack's testimony is incomplete. When asked whether the club could have done anything to prevent the attack, Womack said "Well, they're supposed to check on their VIP rooms for one, every club does." When asked if Oasis could have prevented Doe from punching her, she said, "That first blow, no, it couldn't have been prevented. If he was going to punch me the first time, . . . there's nothing they could have done about that." As to the other punches, however, when the bouncer came into the room Doe was still on top of Womack, and at that point, he was not physically removed but was "asked kindly to stop and step outside."

Counsel for Oasis tried to establish at Womack's deposition that the assault stopped as soon as the bouncer arrived, asking "Once [the bouncer] got in the room, there were no more punches thrown, correct?" She replied, "I was getting punched in the face. I wasn't looking at the door, so I can't say that as he was walking in the door. He wasn't then punching me at the same time, but I know once I noticed [the bouncer] standing there, he quit punching me."

After the incident, Womack sought unsuccessfully to review the surveillance recordings from the front door to try to recognize her assailant or obtain his license tag number or driver's license information. In response to an interrogatory about the club's surveillance system, Oasis denied that the system had not been working that night and denied that the video did not capture an image of Doe. It also said it had no policies to service, inspect, or repair the security system, which was replaced around the time of the assault.

In granting Oasis's motion for summary judgment, the trial court found that the attack against Womack was not foreseeable. It summarily disposed of Womack's argument that the club had violated several provisions of the county Code, a certified copy of which Womack had filed with the court, finding that the record contained "no showing that the DeKalb County Code is applicable to Defendant." In a footnote, the trial court explained that the county Code only applies to property in unincorporated DeKalb, and in this case, while the undisputed evidence showed that the property was located within the county, no evidence established that it was located in *unincorporated* DeKalb County.

On appeal, Womack argues that the trial court erred in granting summary judgment to Oasis on a ground not raised or contested by the club, and argues that the club is not entitled to summary judgment because the attack was foreseeable based on the club's county Code violations. Oasis does not respond directly to the contention that it never argued that the county Code is inapplicable or that Womack failed to prove the club is located in unincorporated DeKalb, but instead argues that the trial court did not grant judgment "sua sponte" but properly ruled on whether "Womack had presented sufficient evidence to prevent summary judgment" after "a full and fair opportunity to respond."

1. Womack argues that the trial court erred in declining to consider whether the evidence presents a genuine issue of material fact regarding the club's compliance with the county Code. We agree. Womack was not required to show that the club was located in an unincorporated part of the county because Oasis never pointed to an absence of evidence regarding that fact. See *Lau's Corp. v. Haskins*, supra, 261 Ga. 491. Oasis admitted its principal offices and agent were located in DeKalb County, and that it was subject to the

jurisdiction and venue of the DeKalb County State Court, and denied it was subject to the municipal ordinances of the City of Doraville. In her response to the club's summary judgment motion, Womack discussed the applicability of the county Code, and in reply Oasis argued only that it was a lawfully established business and that no evidence existed showing that the county considered it a nuisance. Because Oasis did not raise the issue, the burden never shifted to Womack to establish that Oasis was located in unincorporated DeKalb County. Accordingly, the trial court erred in ruling on that basis.

2. Womack also contends that the trial court erred in granting summary judgment to Oasis because the alleged county Code violations constituted negligence per se and established an issue of fact regarding proximate cause and damages. To establish a claim for negligence in Georgia, a plaintiff must show: (1) a legal duty to conform to a standard of conduct raised by law for the protection of others against unreasonable risks of harm; (2) a breach of this standard; (3) a legally attributable causal connection between the conduct and the resulting injury; and (4) loss or damage to plaintiff's legally protected interest. See *Snellgrove v. Hyatt Corp.*, 277 Ga. App. 119, 122 (1) (625 SE2d 517) (2006).

In the typical case of this nature, whether the wrong complained of was foreseeable is a significant issue because if it was not, the defendant had no legal duty to protect the plaintiff from that kind of wrong, and, in general, without previous incidents of a similar nature we have held that the wrong was not foreseeable. As a consequence, without a legal duty there could be no negligence arising from the failure to protect the plaintiff. See, e.g., *Drayton v. Kroger Co.*, 297 Ga. App. 484, 487 (677 SE2d 316) (2009). In this appeal, however, that issue is not significant because the county Code imposed upon Oasis several legal duties to protect Womack. "A statute may create a duty recognized by law requiring the actor to conform to a certain standard of conduct for the protection of others against unreasonable risks, the breach of which constitutes what is sometimes called 'negligence.' Prosser & Keeton on Torts, 5th ed., § 30 (1984)." *Central Anesthesia Assoc. v. Worthy*, 254 Ga. 728, 733 (2) (333 SE2d 829) (1985) (plaintiff established negligence per se by showing that medical practitioner who administered anesthesia was not qualified under statute). See also *McLain v. Mariner Health Care*, 279 Ga. App. 410, 411-412 (2) (631 SE2d 435) (2006) (reversing grant of motion to dismiss negligence per se claim based on alleged violations of nursing home statutes and regulations).

> [G]enerally, negligence per se arises when a statute or ordinance is violated. The violation of certain mandatory

regulations may also amount to negligence per se if the regulations impose a legal duty. OCGA § 51-1-6 provides: "When the law requires a person to perform an act for the benefit of another or to refrain from doing an act which may injure another, although no cause of action is given in express terms, the injured party may recover for the breach of such legal duty if he suffers damage thereby." Assuming that a violation of a statute or mandatory regulation has occurred, before negligence per se can be determined, a trial court must consider (1) whether the injured person falls within the class of persons it was intended to protect and (2) whether the harm complained of was the harm the statute was intended to guard against. Finally, if the court finds negligence per se, the plaintiffs must then demonstrate a causal connection between the negligence per se and the injury. And it is generally a jury question as to whether or not such negligence proximately caused the injury.

(Citations and punctuation omitted.) *Hubbard v. Dept. of Transp.*, 256 Ga. App. 342, 349-350 (3) (568 SE2d 559) (2000).

Thus, the questions arise in this case whether the county ordinances were intended to protect Womack, whether the harm she suffered was the harm the statute intended to guard against, and whether Oasis violated the ordinances and was thus guilty of negligence per se. In drafting the ordinances applicable to adult entertainment establishments, the DeKalb County Board of Commissioners recognized the inherent dangers involved in selling alcohol in the presence of unclothed dancers, and established certain mandatory regulations. It took "note of the notorious and self-evident conditions attendant to the commercial exploitation of human sexuality," and found that adult entertainment establishments "are often associated with criminal behavior." DeKalb County Code, Art. XII, Sec. 15-400. Thus, the county regulates and licenses adult entertainment establishments to reduce the potential for harm and the occurrence of criminal activity.

For example, the county Code specifically prohibits a club from permitting an employee to appear nude where there is an individual payment offer or solicitation of money between patron and employee. Art. XII, Sec. 15-402 (c). The club may not "suffer or permit the use of any areas on the premises of such establishment for . . . private dancing performance or entertainment," and the dancers shall not perform on a platform lower than 18 inches or closer than four feet from a patron. Art. XII, Sec. 15-402 (l), (m). It is uncontradicted in the record before us that the club rented out rooms for private dancing performances, permitted the dancers to appear nude when

330

they were paid directly by patrons, and allowed the dancers to perform closer than four feet from the patrons.

"[F]or a violation of a statute to be negligence per se, it is sufficient if the violation is capable of having a causal connection with the injury and damage inflicted. [Cit.] It is not essential that the injury inevitably flow from the violation." *Central Anesthesia Assoc. v. Worthy*, supra, 254 Ga. at 733 (2), n. 3. Womack falls within the class of persons the law was intended to protect from exploitation and harm, and the club's county Code violations are "capable of having a causal connection" to Womack's injuries and damage. This is sufficient to constitute negligence per se.

Negligence per se, however, "supplies only the duty and breach of duty elements of a tort," and Womack must still prove a causal connection between the breach and her injuries. *Central Anesthesia Assoc. v. Worthy*, supra, 254 Ga. at 730 (1). Whether or not such negligence proximately caused the injury "is generally a jury question." *Hubbard v. Dept. of Transp.*, supra, 256 Ga. App. at 350 (3).

*Judgment reversed. Senior Appellate Judge G. Alan Blackburn and Senior Appellate Judge Marion T. Pope, Jr., concur in judgment only.*

DECIDED OCTOBER 29, 2010 —
RECONSIDERATION DENIED DECEMBER 10, 2010.

*Mayer & Harper, Mark Harper*, for appellant.
*Hawkins, Parnell, Thackston & Young, Thomas R. Mock, Jr.*, for appellee.