**WHOLE COURT**

NOTICE: Motions for reconsideration must be
*physically received* in our clerk's office within ten
days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules/

**November 21, 2014**

# In the Court of Appeals of Georgia

A14A1307. S-D RIRA, LLC v. THE OUTBACK PROPERTY
OWNERS' ASSOCIATION, INC.

BRANCH, Judge.

This case presents the question of whether S-D RIRA, LLC ("RIRA") is
entitled to an easement over a private road located in The Outback subdivision for the
purpose of accessing certain real property RIRA owns in Pickens County and whether
RIRA has the right to travel over a road constructed over and across Lot 10 in The
Outback to reach the private road at issue. RIRA filed a complaint against The
Outback Property Owners' Association, Inc. ("the Association") asserting a statutory
claim to an easement. Alternatively, RIRA claimed it had a contractual right to the
declaration of a private way through the subdivision (the private way to include the
road on Lot 10), based upon The Outback's Declaration of Covenants and the

warranty deed transferring ownership of the subdivision's private roads to the Association. RIRA also sought a declaration that the owner of Lot 10 had the right to extend the subdivision's private road onto and over Lot 10 for the purpose of providing adjoining property owners such as RIRA with access to their property.[1]

RIRA now appeals from an order of the trial court dismissing RIRA's statutory easement claim; granting judgment in favor of the Association on RIRA's contractual claim for a private way and its claim for declaratory relief; denying RIRA's motion for summary judgment on its claim for a private way and its request for declaratory relief; enjoining RIRA from using The Outback's private roads or Lot 10 to access adjoining property, including RIRA's land; and enjoining the owner of Lot 10 from using that property to access adjoining property. RIRA contends that the trial court erred in dismissing without prejudice its statutory claim for an easement for failure to plead the claim with more specificity; in entering a permanent injunction against the owner of Lot 10 in The Outback, who is not a party to this case; in finding that

---

[1] Also named as a defendant in RIRA's lawsuit was Robert P. Jones, in his capacity as the Commissioner of Pickens County. The claims asserted against Jones included a request for a declaratory judgment as to the zoning status of RIRA's property; a request for a Writ of Mandamus requiring the county to rezone the property to Rural Residential, with no other restrictions; and a claim for inverse condemnation. Jones is not a party to this appeal and the claims asserted against him are not at issue.

2

RIRA's contractual claim for a private way and its claim for declaratory relief were barred by both The Outback's Declaration of Covenants and by the theory of unjust enrichment; in denying RIRA's motion for summary judgment; and in granting the Association's claim for injunctive relief against RIRA. For reasons explained below, we reverse the trial court's order dismissing RIRA's statutory claim for an easement; affirm the judgment in favor of the Association on RIRA's contractual claim for a private way and its claim for declaratory relief; vacate the permanent injunction entered against RIRA; vacate the permanent injunction entered against the owner of Lot 10; and remand the case for proceedings consistent with this opinion.

The relevant facts are largely undisputed, but where any doubt existed, we have construed the record in favor of RIRA, as the non-movant on both the motion to dismiss and the motion for summary judgment. See *Thompson v. Lovett*, 328 Ga. App.573 (760 SE2d 246) (2014) (on a motion for summary judgment, we "construe the evidence in the light most favorable to the nonmovant") (citations omitted); *Babalola v. HSBC Bank, USA, N.A.*, 324 Ga. App. 750, 750 (751 SE2d 545) (2013) ("[w]e review de novo a trial court's determination that a pleading fails to state a claim upon which relief can be granted, construing the pleadings in the light most

3

favorable to the [non-movant] and with any doubts resolved in the [non-movant's] favor") (citation and punctuation omitted).

*The Outback Subdivision*

In 1997, Taylor Investment Corporation purchased 416.42 acres of property in Pickens County for the purpose of developing The Outback subdivision. The Outback was developed in three different phases, referred to by the developer as "units," and two separate Declarations of Covenants were filed, with each Declaration covering different units of the development. The Declaration of Covenants as to Units I and II of The Outback was filed on August 14, 1997, and these covenants apply to subdivision lots 1 through 39. The Declaration of Covenants as to Unit III of The Outback was filed on November 12, 1999 and these covenants apply to subdivision lots 40 through 97A. The separate sets of covenants are identical but for the fact that the Unit III covenants have an article addressing access to adjoining property, while the Units I and II covenants do not. The relevant article in the Unit III covenants, Article VIII, provides:

> No tracts in this subdivision shall be used, nor shall any roads streets or rights of way, be placed upon such tracts for ingress and egress to adjoining property, nor shall any road in the subdivision be used to service any adjoining subdivision. This provision shall not, however,

4

apply to the developer or its assigns. Said developer or its assigns may add adjoining property to this subdivision at any time and use its roads to access the same.

No similar language appears in the Units I and II covenants.

On March 8, 2002, Taylor Investment Corporation transferred ownership of The Outback's private roads to the Association. The warranty deed effectuating that transfer states that the Association is "to have and to hold" the roads for the exclusive use and benefit of the Association and its members, subject only to certain permitted exceptions. These permitted exceptions include both the Units I and II covenants and the Unit III covenants.

*The Adjoining Property*

At or about the same time that Taylor Investment Corporation purchased The Outback property, Pickens Prime Properties, LLC, a Georgia corporation owned by Bettina Longino[2] and Katie Lancey, purchased 80 acres of land contiguous to the land purchased by Taylor Investment.[3] Sometime after purchasing this property, Pickens

---

[2] Bettina Longino is the now ex-wife of John Longino; John Longino serves as both the manager of and the attorney for RIRA.

[3] Taylor Investment purchased its property from Cecilia Wheeler and Sylvia and Roy Roberts. The record does not show from whom Pickens Prime Properties purchased its 80 acre parcel.

5

Prime Properties dissolved and the land was split into two parcels. Cliff and Katie Lancey received ownership of a 19.6-acre parcel, part of which adjoins The Outback. The remaining property (approximately 60 acres) was divided between six Georgia LLCs, each of which is wholly owned by The Longino Family Perpetual Trust I ("the Trust").[4] Although each of the six LLCs holds title to approximately 10 acres of the 60-acre property, the parties refer to the entire 60-acre parcel as "the Trust Property." PPP Properties Development, LLC ("PPP"), one of the six LLCs with an interest in the Trust property, holds title to the 10-acre parcel of the Trust Property that adjoins Lot 10 in The Outback subdivision. Neither the Trust nor any of the six Trust LLCs (including PPP) are a party to this action.

In January 2006, PPP purchased Lot 10 from Jerry Goode, who had owned that property since purchasing it from Taylor Development in August 1997. One month later, the various owners of the Trust property successfully petitioned to have all 60 acres rezoned from "Agricultural" to "Rural Residential." In May 2006, PPP constructed what has been referred to alternatively as a road or a widened driveway across Lot 10. This roadway begins at the point where Lot 10 meets the subdivision

---

[4] The Trust was created in February 1999, and John Longino's son, Trevor Longino, serves as its president. During his lifetime, John Longino is the Trust's sole beneficiary and he also serves as the Trust's attorney.

6

road (Outback Ridge Trail) and ends at an access road located on the adjoining 10-acre parcel of Trust Property owned by PPP.[5] On May 28, 2007, the six Trust LLCs entered into an "easement agreement" which provides, in relevant part, that the six Trust LLCs "and any other Georgia [LLC] wholly owned by [the Trust] (and no other entities)," and any successors in title "shall have a perpetual and non-exclusive easement for ingress, egress, and utilities over and across" the roadway that PPP had constructed on Lot 10 in The Outback subdivision.

RIRA is a Georgia limited liability company formed for the purpose of investing the Roth IRA funds of attorney John Longino, and, as noted previously, Longino also serves as RIRA's manager and attorney.[6] On December 4, 2008, RIRA purchased the 19.67 acre parcel of land that had been transferred to Cliff and Katie Lancey when Pickens Prime Properties dissolved.[7] Several days later, RIRA applied

---

[5] According to John Longino, after the Trust LLCs gained title to the Trust Property, they cut a number of roads on that 60-acre property.

[6] The full name of the LLC, S-D RIRA, is an acronym for "self-directed Roth Investment Retirement Account."

[7] Title was transferred to RIRA by two deeds from Appalachian Real Estate Investments, which appears to be a company that is owned or controlled by the Lanceys. One deed conveyed a ten acre tract to RIRA and the second deed conveyed the remaining 9.67 acres.

7

to have its property rezoned from "Agricultural" to "Rural Residential." After hearing objections from a number of homeowners in The Outback, the Pickens County Zoning Board granted this petition with two conditions. Specifically, the rezoning resolution provided that RIRA may only place two houses on the property, as opposed to the one house per 1.5 acres that is normally allowed under rural residential zoning. To build on the property the number of houses normally allowed under rural residential zoning, RIRA would have to obtain access to public roads, with such access being owned by RIRA rather than being "an easement across someone else's property."[8]

*The Current Lawsuit*

On March 26, 2009 RIRA filed the current lawsuit. In response, the Association filed a counterclaim for injunctive relief, seeking to permanently enjoin RIRA from driving on the subdivision's private roads or across Lot 10 to access its property, as well as a motion to dismiss RIRA's claims against it or, in the alternative, a motion for judgment on the pleadings.

---

[8] As incorporated into the rezoning resolution, these conditions refer to Longino, rather than RIRA. Given that RIRA owns the property and filed the rezoning petition, we assume that this is a clerical error, based on the fact that Longino represented RIRA at the hearing on the petition.

After the litigation had been pending for approximately one year, but before the trial court had ruled on its motion seeking a dismissal of RIRA's claims or judgment on the pleadings, the Association filed a motion for summary judgment seeking judgment in its favor on all of RIRA's claims against the Association. RIRA filed a cross-motion for summary judgment as to its claims against the Association. Approximately four years later, on February 7, 2014, the trial court held a hearing on all motions. At the outset of that hearing, the parties acknowledged that the court was to consider the Association's motion to dismiss or, in the alternative, for judgment on the pleadings, as well as RIRA's motion for summary judgment. During that hearing, the Association also argued that if it prevailed on its motion for judgment against RIRA, it was also entitled to the injunctive relief sought in its counterclaim.

After hearing the parties' arguments and evidence, the trial court entered an order granting in part the Association's motion to dismiss, granting in part the Association's motion for summary judgment, granting the Association's request for injunctive relief, and denying RIRA's summary judgment motion. Specifically, the trial court dismissed without prejudice RIRA's claim for a statutory easement, giving RIRA leave to refile that claim if it pled more specific facts supporting it; granted

9

summary judgment[9] in favor of the Association on RIRA's contractual claim for a private way and its claim for declaratory relief, finding that RIRA's requested relief was barred by both the Covenants applicable to Lot 10 and the theory of unjust enrichment; denied RIRA's motion for summary judgment; permanently enjoined RIRA from using The Outback's private roads or the road on Lot 10 for purposes of ingress or egress to either the Trust Property or RIRA's own property; and permanently enjoined PPP (the owner of Lot 10) from using Lot 10 as a means of ingress and egress to either the Trust Property (including the 10-acre parcel of that property immediately adjoining Lot 10, to which PPP holds title) or the RIRA property. RIRA now appeals from that order.

1. We first address RIRA's assertion that the trial court erred in dismissing its statutory claim for an easement under OCGA § 44-9-40. Under that statute, where a

[9] Although the court's order states that it is dismissing these claims with prejudice, it appears that in deciding these claims the court considered evidence outside of the pleadings. Accordingly, we view the trial court's order as granting the Association's motion for summary judgment on these claims. See *Johnson v. RLI Ins. Co.*, 288 Ga. 309, 310 (704 SE2d 173) (2010) (trial court's consideration of matters outside pleadings effectively converts a motion to dismiss into a motion for summary judgment); *Sims v. First Acceptance Ins. Co. of Ga.*, 322 Ga. App. 361, 363 (3) (a) (745 SE2d 306) (2013) (where a trial court considers matters outside the pleadings, a motion for judgment on the pleadings is converted to a motion for summary judgment).

property is inaccessible via a public road or right of way, the property owner may petition the superior court for an easement of necessity, which provides the owner with ingress and egress to his land over the property of another. OCGA § 44-9-40 (a), (b).[10] Here, the trial court dismissed without prejudice RIRA's claim for an easement of necessity, apparently finding that RIRA had failed to state a claim under OCGA § 44-9-40. The trial court indicated, however, that RIRA was free to refile this claim if it pled the cause of action with more specificity. The trial court's order stated that it was dismissing RIRA's claim under OCGA § 44-9-40 and was "hereby requiring [RIRA] to plead, in specific detail, the extent of any requested private condemnation

---

[10] The statute provides that: "When any person or corporation of this state owns real estate or any interest therein to which the person or corporation has no means of, access, ingress, and egress and when a means of ingress, egress, and access may be had over and across the lands of any private person or corporation," the landlocked party may file an action for private condemnation, requesting "an easement of access, ingress, and egress not to exceed 20 feet in width over and across the property of the private person or corporation." OCGA § 44-9-40 (b). The condemning party must pay for the easement and must pay to maintain it. Id. See also OCGA § 44-9-45. Even under this statute, however, the trial court has the discretion to deny the petition if it finds "that the condemnor owns a right of access, ingress, and egress to his property over another route or owns an easement to a right of private way over another route, . . . which alternate route affords such person or corporation a reasonable means of access, ingress, and egress, or where the judge [finds] that the exercise of such right of condemnation by the condemnor is otherwise unreasonable." OCGA § 44-9-40 (b).

11

as well as any alternate routes into [RIRA's] property thereby affording the Outback an opportunity to properly respond."[11] This holding is in error.

"[T]he Georgia Civil Practice Act requires only notice pleading and, under the Act, pleadings are to be construed liberally and reasonably to achieve substantial justice consistent with the statutory requirements of the Act. Thus, most elements of most claims can be pled in general terms, so long as they give fair notice of the nature of the claims to the defendant." *Wylie v. Denton*, 323 Ga. App. 161, 169-170 (3) (746 SE2d 689) (2013) (citations and punctuation omitted). A complaint fails to meet this standard and warrants dismissal

> only if its allegations disclose with certainty that no set of facts consistent with the allegations could be proved that would entitle the plaintiff to the relief he seeks. Put another way, if, within the framework of the complaint, evidence may be introduced which will sustain a grant of relief to the plaintiff, the complaint is sufficient.

*Bush v. Bank of New York Mellon*, 313 Ga. App. 84, 89 (720 SE2d 370) (2011) (citations and punctuation omitted). And when assessing whether the allegations of

---

[11] Although the trial court's order stated that RIRA was seeking "a private way condemnation over Lot 10," a fair reading of the complaint shows that RIRA was seeking an easement over ½ mile of the private road in The Outback known as Outback Trail Ridge.

12

a complaint are sufficient to survive a motion to dismiss, we must accept those allegations as true and view them in the light most favorable to the plaintiff. Id.

In this case, RIRA's complaint alleged that it had used ½ mile of a private road in The Outback to access its property since purchasing that land in 2006; that without such access it had no legal means of ingress and egress that would support the use of the property as rural residential; and that it "has no ability to negotiate and acquire deeded fee simple title to roads to access its property." Attached to the complaint was a plat purportedly showing the landlocked status of RIRA's property. And the complaint stated that RIRA was seeking the declaration of a private way "over the paved private road named 'Outback Trail [Ridge] Road' owned by [the Association], running ½ mile from [Lot 10] to Price Creek Road, a public road." Construed liberally in favor of RIRA, these allegations are sufficient to state a claim for relief under OCGA § 44-9-40. See OCGA § 44-9-40 (b) (the filing of a petition seeking a private way "shall be deemed a declaration of necessity"); *Dovetail Properties v. Herron*, 287 Ga. App. 808, 809 (1) (652 SE2d 856) (2007) (a prima facie case of necessity requires the plaintiff/condemnor to prove that his property is landlocked). See also *Wylie*, 323 Ga. App. at 162-163 ("[o]nly if the pleadings and exhibits incorporated into the pleadings show a complete failure by the plaintiff to state a

13

cause of action, is the defendant entitled to judgment as a matter of law") (citation and punctuation omitted). Accordingly, the trial court erred in dismissing RIRA's statutory claim for an easement of necessity for failure to state a claim.[12]

2. Before analyzing any aspect of the parties' contractual dispute, we first address the question of whether the trial court's injunction against PPP (as the owner of Lot 10) is valid, given that PPP was not named as a party in the trial court and was not present at the hearing below.

The Georgia Civil Practice Act provides that an injunction "is binding only upon the parties to the action, their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them." OCGA § 9-11-65 (d). Thus, the general rule is that "[a] trial court abuses its discretion by enjoining nonparties," absent some evidence that the nonparty was in "active concert or participation" with a named party. *BEA Systems v. WebMethods*, 265 Ga. App. 503, 509 (2) (595 SE2d 87) (2004) (citation and punctuation omitted).

_____

[12] In reaching this conclusion, we do not address whether a property is "landlocked" within the meaning of OCGA § 44-9-40 simply because it has inadequate access to support the property owner's desired use of that property. The record shows that this issue was neither raised nor argued in either the court below or in this Court. Nor do we analyze what impact, if any, the applicable covenants would have on RIRA's right to an easement of necessity.

14

Here, the evidence showed that RIRA's manager and lawyer, John Longino, is the sole beneficiary of both RIRA and the Trust that owns PPP, which holds title to both Lot 10 and a portion of the Trust Property. Longino serves as the attorney for the Trust, and also serves as the attorney and registered agent for each of the six LLCs (including PPP) that hold title to the Trust Property. At his deposition, Longino asserted his belief that he was authorized to testify on behalf of PPP and opined that RIRA and PPP are related entities.[13] The record also shows that Longino is the individual who authorized and directed the construction of the roadway across Lot 10. According to Longino, at the time the road was constructed, his intent was that the road would also be used to access what is now the RIRA property, in the event that either Longino (or an entity in which Longino had an interest) ever purchased that property. Longino, who drafted the easement agreement between the six Trust LLCs providing that all six may use the Lot 10 road to access their portion of the Trust Property, stated that at the time he drafted the easement it was his intent to acquire the RIRA property through one of the Trust LLCs, "but instead I created a new LLC [RIRA] to obtain title to [that property]." Longino further testified that

_____

[13] Longino based his opinion on the fact that "[PPP] is owned by a trust that I'm sole beneficiary of [and RIRA] is owned by an IRA that I'm the sole beneficiary of."

15

RIRA would eventually hold rights under that easement, because the easement applies to any LLC owned by the Trust and he intended to have ownership of RIRA transferred to the Trust.

This undisputed evidence, including Longino's admission as to the relationship between RIRA and PPP, shows that PPP was in "active concert or participation" with RIRA with respect to the enjoined activity (the use of Lot 10 to access adjoining property) and that Longino was effectively representing PPP below. See *BEA Systems*, 265 Ga. App. at 509 (2). Accordingly, PPP's status as a nonparty does not render invalid the injunction against PPP.

Our conclusion on this issue is reinforced by the fact that PPP did not appeal this ruling even though under Georgia law, once the trial court enjoins a nonparty, "that nonparty becomes a party with standing to appeal." *Barham v. City of Atlanta*, 292 Ga. 375, 376 (1) (738 SE2d 52) (2013) (citations omitted). The evidence showing that PPP was in concert with RIRA as to the use of Lot 10 also shows that PPP had notice of this action and notice of the injunction entered against it. Despite this notice, however, PPP failed to file a direct appeal on its own behalf. Instead, PPP has relied on RIRA to represent its interests with respect to that injunction. And given PPP's knowledge of this lawsuit and its failure either to intervene in the suit below or

16

exercise its right to a direct appeal in this Court, it appears that PPP is also relying on RIRA to protect its interests with respect to the parties' dispute regarding the meaning of The Outback's restrictive covenants. See *Hurt Bldg. v. Atlanta Trust Co.*, 181 Ga. 274, 287 (182 SE 187) (1935) ("'One who had full knowledge of the pendency of a case in which he has a direct pecuniary interest, and neither sought to become a party thereto nor made any effort to intervene therein so as to protect his rights, cannot, after the rendition of a judgment in favor of the plaintiff in such suit, maintain an equitable petition to set such judgment aside or restrain its enforcement.'") (citations omitted), quoting *Fitzgerald v. Bowen*, 114 Ga. 691 (40 SE 735) (1902); *Brownlee v. Brownlee*, 203 Ga. 377, 381 (2) (46 SE2d 901) (1948). See also OCGA § 9-11-17 (a) (where the real party in interest has ratified a lawsuit in which it was not named as the plaintiff, that suit "shall have the same effect as if the action had been commenced in the name of the real party in interest"). Accordingly, the injunction against PPP is valid even though it is not a named party to this lawsuit. Additionally, in light of the fact that PPP has relied on RIRA to assert its rights and protect its interests throughout this litigation, we proceed to address the parties' contractual claims.

3. We next consider whether the trial court erred in granting judgment in favor of the Association on RIRA's contractual claim for declaration of a private way by written agreement. The "written agreement" to which this claim refers is the Declaration of Covenants for Units I and II of The Outback, read together with the Declaration of Covenants for Unit III and the warranty deed transferring ownership of The Outback's private roads from the developer to the Association. RIRA points to the fact that the Units I and II covenants do not expressly prohibit property owners from constructing roads on their lots or from otherwise allowing their lots to be used as a means of ingress and egress to adjoining properties. And, RIRA contends, the Units I and II covenants must be read together with the Unit III covenants, which explicitly prohibit property owners in that part of the subdivision from building roads on their lots or otherwise using their property to provide access to adjoining land. When so read, RIRA reasons, the parties to the Units I and II covenants clearly intended to allow property owners in that part of the subdivision to use their lots to access adjoining property. Moreover, this use, which is allowed by the covenants, is excepted from the warranty deed's requirement that the Association hold the roads for the sole use and benefit of property owners within The Outback. RIRA asserts that when read together, these documents permit PPP to extend the private road on which

18

Lot 10 fronts (Outback Trail Ridge) over and across Lot 10, thereby providing RIRA and the various owners of the Trust property (and presumably anyone who subsequently takes title to any portion of those lands) with ingress to and egress from their property.

The Association moved to dismiss this claim on the grounds that RIRA lacked standing to assert a cause of action under the applicable covenants and/or to assert rights belonging to PPP, as the owner of Lot 10. Alternatively, the Association sought judgment on the pleadings on the grounds that the Units I and II Covenants, particularly when read in conjunction with the Unit III covenants and the warranty deed under which the Association took title to the subdivision roads, show that the parties did not intend to allow individual property owners to expand the subdivision's private roads over residential lots for the purpose of serving property outside the subdivision. The Association subsequently sought summary judgment on RIRA's contractual claim on these same grounds.

The trial court granted judgment in favor of the Association on this claim, based on two legal findings. First, the court found that the stated purpose of the applicable covenants reflects an intent to prohibit the use of the subdivision's individual lots and private roads as a means of ingress and egress to adjoining

19

property. The court further found that "[t]he equitable doctrine of unjust enrichment would preclude a party from utilizing the property of another, improved and maintained at great expense[,] without a lawful right [and] without paying just compensation if that right should ever be granted."[14] RIRA challenges these findings on appeal.

(a) RIRA contends that the trial court erred in dismissing its contractual claim on the grounds that it lacked standing to assert that claim. But the trial court's order does not address the issue of standing; rather, it appears that in deciding this claim the trial court assumed, without deciding, that RIRA had standing to assert it. Accordingly, this argument is without merit.

(b) RIRA further asserts that the trial court erred in finding that its contractual claim was barred by the doctrine of unjust enrichment. We agree with RIRA that it was inappropriate for the trial court to grant summary judgment against it based upon a legal theory that had been neither raised nor argued by the parties. See *Womack v. Oasis Goodtime Emporium I*, 307 Ga. App. 323, 328 (1) (705 SE2d 199) (2010) (finding that the trial court erred in granting summary judgment on a ground that had

---

[14] Notably, the trial court raised the theory of unjust enrichment sua sponte, when issuing its ruling at the hearing below. The issue had been neither raised nor argued by the parties.

20

not been raised by the movant). Additionally, RIRA is correct that the doctrine of unjust enrichment is inapplicable to its claim for the declaration of a private way by written agreement. The doctrine of unjust enrichment applies in the absence of a written contract between parties; where such a contract exists, however, it is the contract that governs the dispute and neither party can rely on the doctrine of unjust enrichment. See *Tuvim v. United Jewish Communities*, 285 Ga. 632, 635 (2) (680 SE2d 827) (2009); *Marvin Hewatt Enterprises v. Butler Capital Corp.*, 328 Ga. App. 317, 322 (4) (761 SE2d 857) (2014). Thus, because the dispute is governed by the Unit I and II Covenants, unjust enrichment is inapplicable. For reasons explained below in Division 2 (c), however, the trial court's error in raising and applying the theory of unjust enrichment does not warrant reversal of the court's grant of summary judgment in favor of the Association.

(c) RIRA also argues that the trial court erred in concluding that the Units I and II Covenants do not permit PPP to extend the private subdivision road over Lot 10 and connect that road with property outside of the subdivision. We disagree.

A property owners' declaration of covenants is a contract whose construction, interpretation, and legal effect is a question of law. *Crouch v. Bent Tree Community*, 310 Ga. App. 319, 320 (1) (713 SE2d 402) (2011). The cardinal rule of contract

21

interpretation is to construe the contract so as to effectuate the intent of the parties. *Crabapple Lake Parc Community Assn. v. Circeo*, 325 Ga. App. 101, 104 (1) (a) (751 SE2d 866) (2013). Where that intent is evident from the plain language used in the covenants, the court's job "is simply to apply that language as written." *Hall v. Town Creek Neighborhood Assn.*, 320 Ga. App. 897, 899 (740 SE2d 816) (2013) (citation omitted). When the covenants are "less clear," however, a court must attempt to ascertain their intent from an examination of the entire document as a whole, bearing in mind two factors. First, "covenants are to be interpreted so as to give a reasonable, lawful and effective meaning to all manifestations of intention by the parties rather than an interpretation which leaves a part of such manifestations unreasonable or of no effect." *Crabapple Lake Parc*, 325 Ga. App. at 105 (1) (a) (citation and punctuation omitted). Second, the intent underlying all such covenants is to provide restrictions that will "inure to the benefit of all property owners affected." *Crouch*, 310 Ga. App. at 320 (1). "If the manifest intent of the parties can be ascertained from the covenants as a whole, no ambiguity exists, and there is no need for judicial construction." *Grave de Peralta v. Blackberry Mountain Assn.*, 315 Ga. App. 315, 317 (726 SE2d 789) (2012) (citation and punctuation omitted).

22

Applying these rules of interpretation, we find that when read as a whole, the covenants at issue do not allow individual lot owners to extend the subdivision's private roads over their lots or otherwise use their lots to provide access to adjoining property. The stated purpose of the Units I and II covenants, found in Article I of the Declarations,

> is to insure the best use and the most appropriate development and improvement of the Subject Property; to protect owners of Subject Property against such use of surrounding property as will detract from the values of their property; to preserve, so far as practicable, the natural beauty of Subject Property; to insure the highest and best development for Subject Property; to encourage and secure the erection of attractive structures thereon with appropriate locations thereof on each parcel; to promote harmonious improvement of Subject Property; to secure and maintain proper setbacks from the roads, and adequate free spaces between structures; and in general to provide adequately for a high type in quality and improvement in Subject Property and thereby to preserve and enhance the value of investments made by purchasers of Subject Property therein.

We agree with the trial court that this language reflects an intent to restrict the lots to their currently zoned use as rural residential and to prohibit any activity that would or could have an adverse impact on either the appearance of or the property values in the subdivision. Using a lot as a roadway to provide non-subdivision

23

property owners with access to their property does not amount to a "best use" or "most appropriate development" of that lot, which remains residential. Moreover, such a use would adversely impact, at the very least, the value of those subdivision properties in close proximity to the lot being used as a through way. The impact would be even more significant in a case such as this, where the road allegedly being extended over Lot 10 (Outback Trail Ridge Road) was platted and constructed as a cul de sac, not a thoroughfare.

The conclusion that the covenants do not permit a landowner to extend a road over his lot is further supported by at least three additional covenant provisions. First, Article II of the covenants, "Use of Land," provides in part that "[n]o noxious or offensive . . . activity shall be carried on upon the Subject Property, nor shall anything be done thereon which may become an annoyance or a nuisance to the neighboring properties." The traffic created by non-subdivision homeowners using a subdivision road to access their property could no doubt become "a nuisance or annoyance to neighboring properties." This is especially true where, as here, the road was extended by an individual property owner over a residential lot and beyond what had been the road's dead end.

24

Additionally, Article X of the covenants states: "No provisions contained herein shall be construed to restrict [Taylor Investment Corporation's] or their assigns' right to construct roads . . . ." This language supports the conclusion that the parties intended the covenants to prohibit the construction of roads by anyone other than the developer. Finally, Article VII of the covenants provides that maintenance of The Outback's roads "will be the responsibility of the property Owners. The cost of this maintenance will be divided equally among all Owners." This Article also reflects an intent to limit the use of the subdivision's private roads to property owners within the subdivision and their guests. It is illogical to think that the parties intended to allow the private roads, maintained at the expense of the property owners, to be used as a means of ingress and egress to neighboring properties, whose owners would be under no obligation to contribute to the cost of maintaining those roads.

Ignoring the foregoing provisions of the Units I and II covenants, RIRA argues that our analysis of this issue is controlled by Article XIII of the Unit III covenants, which expressly prohibits both the use of any tract in the subdivision "for ingress and egress to adjoining property," and the use of "any road in the subdivision . . . to service any adjoining subdivision." The absence of this article from the Units I and

25

II covenants, RIRA contends, means that the parties did not intend to prohibit any such uses of lots and roads in that part of The Outback. We disagree.

The mere fact that the Unit III covenants employ more specific language to express the parties' intent on this issue does not mean that no such intent is manifested in the Units I and II covenants. And in determining the parties' intent as to the Units I and II covenants, we need not look beyond the applicable Declaration of Covenants unless we find that document to be ambiguous. See *Crabapple Lake Parc*, 325 Ga. App. at 105 (1) (a) (where ambiguities exist in a declaration of covenants, "the court may look outside the written terms of the contract and consider all the surrounding circumstances to determine the parties' intent. Parol evidence may not be considered unless the written instrument is ambiguous") (citation and punctuation omitted). As previously explained, however, the Units I and II covenants clearly reflect the parties' intent that neither individual lots nor the subdivision's private roads be used to provide access to adjoining property. Accordingly, the Unit III covenants are, in this instance, irrelevant to our interpretation of the Units I and II covenants. Id.

As the foregoing demonstrates, when read as a whole the Units I and II covenants show that the parties intended to prohibit the use of the subdivision's lots

26

or roads for the purpose of serving adjoining properties. We therefore affirm the trial court's grant of summary judgment in favor of the Association on RIRA's claims for declaration of a private way and declaratory relief.

4. RIRA claims that the trial court erred in denying its motion for summary judgment on its contractual claim for the declaration of a private way and its claim for declaratory relief because the Unit I and II covenants are void and therefore unenforceable. We find this argument to be without merit.

In 2005, Pickens County enacted a zoning ordinance which became effective on May 2 of that year. At that time, all property in the county became subject to OCGA § 44-5-60, which provides, in relevant part:

> (b) . . . covenants restricting lands to certain uses shall not run for more than 20 years in municipalities which have adopted zoning laws nor in those areas in counties for which zoning laws have been adopted; provided, however, that whenever a zoning ordinance, upon its initial enactment by a county or municipality, expressly acknowledges the continuing application of a covenant restricting lands to certain uses within that jurisdiction, any such covenant, if created prior to zoning laws being adopted by that county or municipality, shall continue to be effective in such jurisdiction until the expiration of such covenant in accordance with its terms. . . .
> (d)(1) Notwithstanding the limitation provided in subsection (b) of this Code section, covenants restricting lands to certain uses affecting

27

planned subdivisions containing no fewer than 15 individual plots shall automatically be renewed beyond the period provided for in subsection (b) of this Code section unless terminated as provided in this subsection. Each such renewal shall be for an additional 20 year period, and there shall be no limit on the number of times such covenants shall be renewed.

OCGA § 44-5-60 (b), (d) (1).

The Units I and II Declaration of Covenants, which was filed in August 1997, provides that the covenants "are to run with the land for a period of twenty-five (25) years" from the date of their recordation and that after that time, the covenants "shall be automatically extended for successive period of ten (10) years," unless amended by a majority of the property owners. At the time the zoning ordinance was enacted, Pickens County did not expressly acknowledge the continuing application of The Outback's covenants. RIRA argues that this failure by the county means that those covenants were rendered void on the day the zoning ordinance became effective, because their term exceeded 20 years. This argument finds no support in the law.

Georgia's appellate courts have interpreted OCGA § 44-5-60 to mean that any covenants which were in place at the time a zoning ordinance became effective, but whose term exceeded the 20 year maximum allowed under the statute, may remain

28

in effect for no more than 20 years after the zoning ordinance is adopted. *Rowland v. Kellos*, 236 Ga. 799, 800 (1) (225 SE2d 302) (1976) (interpreting former Georgia Code § 29-301, the predecessor to OCGA § 44-5-60); *Turtle Cove Property Owner's Assn. v. Jasper County*, 255 Ga. App. 560-561 (566 SE2d 368) (2002). Thus, the Units I and II covenants may remain in effect until the earlier of either May 2, 2025 (20 years after the zoning ordinance became effective) or until they expire as provided in the Declaration of Covenants. Accordingly, these covenants will expire by their own terms on August 4, 2022 (25 years after the declaration was filed), at which time they will be subject to the automatic renewal provisions of OCGA § 44-5-60 (d).

5. RIRA argues that the Association's claim for injunctive relief to prohibit the use of the subdivision roads and Lot 10 to access adjoining property is barred by the applicable statute of limitations. RIRA thus asserts that the trial court erred in failing to grant RIRA summary judgment on its claim for declaratory relief and in granting the Association's request for permanent injunctive relief. While we agree that the trial court erred in entering permanent injunctions against RIRA and PPP, the court correctly denied RIRA's motion for summary judgment, because factual questions remain on whether the Association's claim for injunctive relief is time-barred.

29

Under Georgia law, all actions alleging the violation of a restrictive covenant, except for violations for failure to pay assessments or fees, must be brought within two years after the right of action accrues. See OCGA § 9-3-29 (a). And OCGA § 9-3-29 (c) specifically provides that the right of action accrues "*immediately* upon the violation of the covenant restricting lands to certain uses." (Emphasis supplied.) RIRA asserts that both the Lot 10 road, as well as a gate regulating access to that road, have been in place since 2006; that since that time, PPP and the other owners of the Trust Property have used the road and gate to access their properties; and that RIRA has used the road and gate to access its land since purchasing it in December 2008. According to RIRA, the use of the roadway since 2006 by the holders of the Trust property to access adjoining property means that the Association's right to challenge the road and its use expired in 2008.

The Association responds to RIRA's statute of limitation argument by pointing to this Court's prior decisions in *Black Island Homeowners Assn. v. Marra*, 263 Ga. App. 559 (588 SE2d 250) (2003) and *Marino v. Clary Lakes Homeowners Assn.*, 322 Ga. App. 839 (747 SE2d 31) (2013). In *Black Island*, the court applied the law of continuing nuisance to hold that the running of the statute of limitation under OCGA § 9-3-29 depends upon the specific conduct that allegedly violated the restrictive

30

covenants. 263 Ga. App. at 561 (1) (b). Thus, the court concluded that where a property owner places a "permanent fixture" on his property, then the statute of limitation begins to run "when the violation [of the restrictive covenants] first results." Id. Where the alleged violation results from ongoing conduct of the property owner, however, the court found that the statute of limitation begins to run anew every time the owner engages in the challenged conduct. Id. In support of this conclusion, the court cited *City of Gainesville v. Waters*, 258 Ga. App. 555 (574 SE2d 638) (2002), which addressed whether a *nuisance* was permanent or continuing for the purpose of applying the statute of limitation found in OCGA § 9-3-30. *Waters*, in turn, relied on the well-established law that "[w]here a *nuisance* is not permanent in its character, but is one which can and should be abated by the person erecting or maintaining it, *every continuance of the nuisance* is a fresh nuisance for which a fresh action will lie." Id. at 558 (3) (emphasis supplied). Relying on the foregoing language, the *Black Island* court concluded that each instance of the property owner's mowing his undeveloped property in violation of a restrictive covenant was a "distinct, separate act that constitutes an alleged breach each time it occurs." 263 Ga. App. at 561 (b). In short, *Black Island* interpreted OCGA § 9-3-29 as providing neighborhoods with an unlimited time in which to sue for any "repetitive act" done

31

by a homeowner in violation of the neighborhood's covenants, no matter how long the homeowner had been engaging in that activity.

Relying solely on *Black Island*, *Marino* held that "a right of action based on a covenant violation caused by a permanent fixture accrues when the violation first results. In contrast, a right of action based on a covenant violation caused by a repetitive act accrues each time the distinct and separate act that constitutes an alleged breach occurs." 322 Ga. App. at 843-844 (1) (citations and punctuation omitted). Applying that law, the court concluded that the statute of limitation had not run on the homeowners' association's right to enforce the restrictive covenant that prohibited homeowners from using their garage for storage and from parking cars in their driveways, even though the homeowners at issue had been engaging in such conduct for more than 15 years. The court found that "each act of the [homeowners] parking their vehicles on their property other than in their garage, which was being used for storage, was a separate and distinct act that gave rise to a new cause of action for an alleged violation of the Garage Use Covenant." Id. (citation omitted).

On this appeal, the Association cites the reasoning of *Black Island* and *Marino* to support two arguments as to why the limitation period under OCGA § 9-3-29 has not run on its claim for injunctive relief. First, the Association argues that under

32

Georgia law, the road is not a fixture. Second, the Association points to the fact that it is seeking to enjoin *the use* of the road and argues that each time the Lot 10 roadway is used in violation of the restrictive covenants a new violation occurs and the statute of limitation begins to run anew.

The Association persuasively argues that under Georgia law a roadway would not be considered a fixture but instead would fall within the definition of realty. As this Court has previously explained,

> Georgia law provides that "realty" or "real estate" includes lands and buildings thereon and all things permanently attached to lands and buildings. OCGA § 44-1-2 (a)[15]. . . . The term "fixtures" embraces all those chattels which by reason of their annexation to land partake both of the nature of personalty and realty, irrespective of whether they are removable.

*Hargrove v. Jenkins*, 192 Ga. App. 83, 84 (383 SE2d 636) (1989). See also Black's Law Dictionary (9th Ed. 2009) (defining "chattel" as "[m]ovable or transferable

---

[15] OCGA § 44-1-2 (a) defines "realty" or "real estate" as: "All lands and the buildings thereon;. . . [a]ll things permanently attached to land or to the buildings thereon; and . . . [a]ny interest existing in, issuing out of, or dependent upon land or the buildings thereon."

property; personal property; esp., a physical object capable of manual delivery and not the subject matter of real property").

We need not decide this issue, however, because the Association is not challenging the existence of the Lot 10 road –i.e., the Association is not seeking to have PPP remove that road from its property.[16] Instead, as both its claim for injunctive relief and its appellate brief make clear, the Association is challenging the use of the Lot 10 road to access adjoining property, in violation of the Units I and II covenants. Given the relief sought by the Association, therefore, we must decide when the statute of limitation began to run on the use of the Lot 10 road.

The Association relies on *Black Island* and *Marino* to argue that the statute of limitation begins to run anew every time someone drives across the Lot 10 road to access property outside of The Outback. *Black Island* and *Marino*, however, represented a departure from previously established law. In *Helmley v. Liberty County*, 242 Ga. App. 881 (531 SE2d 756) (2000), the court addressed whether the statute of limitation in OCGA § 9-3-29 barred the claim of neighboring property

---

[16] The Association has produced evidence showing that at the time the Lot 10 road was constructed, Longino represented to the Association that he was "cutting a driveway" on the property. And it appears that the Association has no problem with the existence of the Lot 10 roadway, provided it is confined to use as a driveway serving only Lot 10.

34

owners against an individual who operated a commercial business on his property, in violation of a restrictive covenant prohibiting that use. Although the neighbors conceded that the business had been located on the property for more than two decades, they argued that the proposed expansion of the business constituted "a fresh violation of the restrictive covenant" on which the statute of limitation had not run. Id. at 884 (2). The court rejected this argument, explaining that

> Appellants are essentially arguing that [the] business is a continuing violation of the restrictive covenant. But the continuing violation theory does not apply in these circumstances. . . . Appellants . . . are suing for breach of a restrictive covenant, not for maintenance of a nuisance. We have found no cases applying the continuing nuisance theory to a claim for breach of a restrictive covenant.

Id. (footnotes omitted).

While *Black Island* and *Marino* acknowledged *Helmley*, they purported to distinguish that holding on the grounds that *Helmley* involved a fixture that was erected in violation of a restrictive covenant, while the later cases each involved repetitive acts that violated a restrictive covenant. Neither *Black Island* nor *Marino*, however, offered any explanation as to why the tort law concept of continuing nuisance should be applied to a contractual claim for breach of a restrictive covenant,

35

and we can discern no legal basis for doing so. In addition to finding no legal basis for applying a tort theory to resolve a contractual claim, we also find that the application of the continuing nuisance theory to determine the running of the statute of limitation for a claim for breach of restrictive covenant conflicts with the express language of OCGA § 9-3-29 (c). That statute expressly provides that the right to sue for violation of a restrictive covenant accrues "*immediately* upon the violation of the covenant restricting land to *certain uses*." (emphasis supplied). See *Helmley*, 242 Ga App. at 881 (3) (also emphasizing the statute's use of the word "immediately"). Moreover, as the above-emphasized language shows, OCGA § 9-3-29 speaks in terms of restrictions on the "use" of land. This statutory language reinforces our conclusion that the continuing nuisance theory is inapplicable to determine when a cause of action accrues under OCGA § 9-3-29. Under the express language of the statute, the limitation period begins to run "immediately" upon a property owner's first "use" of his property in violation of a restrictive covenant. Accordingly, to the extent that *Black Island* and *Marino* apply the continuing nuisance theory to determine when the statute of limitation begins to run under OCGA § 9-3-29, those cases are hereby overruled.

Although the special concurrence asserts that *Black Island* and *Marino* were rightly decided and need not be overruled, there are several flaws in its analysis. First, the special concurrence simply declares that the Lot 10 road is a fixture, without analysis. Additionally, the special concurrence's assertion that the covenant violation at issue is the existence of the Lot 10 road, rather than its use, is based upon a single sentence selectively quoted from the Association's brief. A reading of the entire brief, however, makes clear that the Association is challenging the use of the road, i.e., the Association's claim is that the Lot 10 road violates the covenants because of the way in which the road is being used.[17] This fact is further demonstrated by the

---

[17] The Association's brief states, in relevant part:
The covenant violation in question in this action is the construction of a roadway across Lot 10. . . . [T]he construction of the road leads, by logic, to the conclusion that it will be used or is being used to service [RIRA's] property. . . . [E]ach time that the road is used to service or access [RIRA's] property it is a new and separate violation of the covenant. [The Association] submits that the roadway is not a fixture or structure and the use of the roadway constitutes a continuing violation of the Outback covenants to which the two year statute of limitations does not apply. See, decision of this court *Black Island*, . . . . However, assuming, arguendo, that there is a two year statue of limitation, then [the limitation period] must be viewed in the context of [the Association's] counterclaim and the relief that it sought, i.e. an

Association's counterclaim for injunctive relief, which sought to enjoin RIRA from using either the Lot 10 road or The Outback's private roads to access the RIRA property.

Moreover, all of the Georgia law cited by the special concurrence in support of the proposition that *Black Island* was correctly decided has one source: the *Black Island* decision itself. See *Marino*, 322 Ga. App., at 843 (1); 2 Pindar's Georgia Real estate Law and Procedure, §19:193, n. 1 (7th Ed.) (updated April 2014) (reciting the holding in *Black Island*). Finally, the special concurrence cites decisions from other jurisdictions in which the court applied the theory of continuing tort to determine when a cause of action for breach of a restrictive covenant accrued. Notably, however, there is no comparison of the statutory language (if any) at issue in those cases with the language of OCGA § 9-3-29. In the absence of any indication that the courts from other jurisdictions were applying language similar to that found in OCGA § 9-3-29, those cases are not persuasive.

_____

injunction against [RIRA] preventing it from being able to go from its property through the [T]rust properties to and through [T]he Outback Lot 10 property so as to access [T]he Outback private roads.

(a) Under the foregoing analysis, the statute of limitation on the Association's right to seek injunctive relief against PPP, as the owner of Lot 10, began to run at the time PPP first used the road on Lot 10 in a manner that violated the Units I and II covenants. From the record before us, however, we cannot determine when that use began. We therefore remand to the trial court for a determination of when the Association's cause of action accrued. In making this determination, the court should consider any questions of tolling that might be applicable to the statute of limitation issue. See, e. g., OCGA § 9-3-96 ("[i]f the defendant or those under whom he claims are guilty of a fraud by which the plaintiff has been debarred or deterred from bringing an action, the period of limitation shall run only from the time of the plaintiff's discovery of the fraud"); *Devins v. Leafmore Forest Condominium Assn.*, 200 Ga. App. 158, 159 (2) (407 SE2d 76) (1991) (finding that the plaintiff's claims for breach of a restrictive covenant were neither waived nor time-barred under OCGA § 9-3-29, noting that "there is no waiver where there is no knowledge of the breach of the restrictive covenant by those who have a right to enforce it"). Given the factual

39

questions that remain as to the running of the statute of limitation, we vacate the permanent injunction against PPP, as the owner of Lot 10.

(b) It is unclear whether RIRA is entitled to assert the statute of limitation found in OCGA § 9-3-29 as a defense to the Association's claim for injunctive relief against RIRA. The statutory language reflects that this particular limitation period applies only to claims that are based upon a violation of a restrictive covenant. As the Association has pointed out repeatedly throughout this litigation, however, RIRA is not a party to the restrictive covenants. We therefore remand to the trial court for a determination of whether any injunctive relief against RIRA can be based on PPP's violation of the restrictive covenants and/or whether the Association has asserted another basis for that injunctive relief.[18] As part of its analysis, the trial court should also determine when the statute of limitation accrued on the Association's claim for injunctive relief against RIRA. Accordingly, because substantive questions remain as to the Association's claim for injunctive relief against RIRA, we vacate the

---

[18] In its counterclaim and appellate brief, for example, the Association does not distinguish between any legal theory on which it relies in requesting injunctive relief prohibiting RIRA from using The Outback's private roads to access RIRA's property and any legal theory on which it relies to support its request that RIRA be enjoined from using the Lot 10 roadway to access either the RIRA property or the Trust Property.

permanent injunction against RIRA.[19] On remand, the Association would have the right to seek temporary injunctive relief against RIRA and PPP, should it so desire.[20]

For the reasons set forth above, we reverse that part of the trial court's order dismissing RIRA's statutory claim for an easement; affirm that part of the order granting judgment in favor of the Association on both RIRA's contractual claim for the declaration of a private way and its claim for declaratory relief; vacate the permanent injunction against RIRA; and vacate the permanent injunction against PPP. The case is remanded for proceedings consistent with this opinion.

*Judgment affirmed in part, reversed in part, vacated in part, and case remanded with direction. Andrews, P. J., Dillard, Boggs and Ray, JJ., concur. Phipps, C. J., Barnes, P. J., Ellington, P. J., Doyle, P. J., and Miller and McFadden, JJ., concur in Divisions 1, 2, 3, and 4, and in the judgment. McMillian, J., concurs in Division 5 and in the judgment.*

---

[19] Although we are remanding for further proceedings on both RIRA's claim for a statutory easement and the Association's claim for injunctive relief, we emphasize that these are two separate issues. Even if the Association is not entitled to injunctive relief, that fact, without more, would not entitle RIRA to the statutory easement that it seeks. As set forth above in Division 1, the question of RIRA's entitlement to such an easement is controlled by OCGA § 44-9-40. And "[t]he statute of limitation[] for enforcing violations of restrictive covenants [is] inapplicable" to claims "based upon the alleged existence of easements." Estate of *Seamans v. True*, 247 Ga. 721, 723 (4) (279 SE2d 447) (1981).

[20] Our observation as to the Association's right to request this relief should not be interpreted as a comment on the merits of any petition seeking a temporary injunction.

41

A14A1307.  S-D RIRA, LLC v. THE OUTBACK PROPERTY

OWNERS' ASSOCIATION, INC.

BARNES, Presiding Judge, concurring specially.

I concur fully in Divisions 1-4 of the majority opinion, and with the judgment in Division 5.  I write separately because I disagree with the conclusion reached in Division 5 of the majority opinion that *Marino v. Clary Lakes Homeowners Assn.*, 322 Ga. App. 839 (747 SE2d 31) (2013), and *Black Island Homeowners Assn. v. Marra*, 263 Ga. App. 559 (588 SE2d 250) (2003), should be overruled.  As explained below, neither of those two cases affect the outcome in the present case, and thus we need not reach the question whether they should be overruled.  Furthermore, both cases were correctly decided and appropriately apply a "continuing violation" rule where the right of action is based on a restrictive covenant violation caused by separate and distinct repetitive acts.

"All actions for breach of any covenant restricting lands to certain uses shall be brought within two years after the right of action accrues, excepting violations for

failure to pay assessments or fees[.]" OCGA § 9-3-29 (a). The right of action accrues "immediately upon the violation of the covenant restricting lands to certain uses." OCGA § 9-3-29 (c). Construing these provisions, we have held that "a right of action based on a covenant violation caused by a permanent fixture accrues when the violation first results." *Marino*, 322 Ga. App. at 843 (1), quoting *Black Island*, 263 Ga. App. at 561 (1) (b). See *Helmley v. Liberty County*, 242 Ga. App. 881, 883-884 (2) (531 SE2d 756) (2000) (right of action accrued when business was constructed on property). Significantly, however, we have further held that a different rule applies where the right of action is based on a covenant violation caused by distinct and separate repetitive acts rather than by a permanent fixture; in that scenario, the right of action "accrues each time the distinct and separate act that constitutes an alleged breach occurs." (Citation and punctuation omitted.) *Marino*, 322 Ga. App. at 843 (1), quoting 2 Pindar's Ga. Real Estate Law & Procedure § 19:193, n. 1 (7th ed.) (updated April 2014). See id. at 844 (1) (each act of the defendants "parking their vehicles on their property other than in their garage, which was being used for storage, was a separate and distinct act that gave rise to a new cause of action for an alleged violation of the [restrictive covenant in question]"); *Black Island*, 263 Ga. App. at 561 (1) (b) (each act of the defendant mowing grass of undeveloped property

2

in violation of restrictive covenant was "a distinct, separate act that constitute[d] an alleged breach each time it occur[red]").

In this case, the uncontroverted record shows that the counterclaim for injunctive relief asserted by the Outback Property Owners Association, Inc. (the "Association") is based on restrictive covenant violations caused by a permanent fixture, namely, the roadway constructed across Lot 10 to service the properties owned by the limited liability companies connected to John Longino, including S-D RIRA, LLC ("RIRA"). See OCGA § 44-1-6 (a) ("Anything which is intended to remain permanently in its place even if it is not actually attached to the land is a fixture which constitutes a part of the realty and passes with it."). Cf. *Trust Co. Bank v. Huckabee Auto Co.*, 58 B. R. 826, 830 (Bankr. M.D. Ga. 1986) (ramps providing access for automobiles constituted fixtures). But for the roadway constructed to service the properties, there would be no covenant violations. Indeed, the Association in its appellee brief directly links the covenant violations occurring in this case with "the construction of a roadway across Lot 10" that "will be used or is being used to service [RIRA's] property." Accordingly, under our existing precedent, the Association's right to seek injunctive relief accrued in May 2006, when the permanent fixture, the roadway, was constructed.

3

It follows that the Association's counterclaim for injunctive relief against PPP Properties Development, LLC ("Properties Development"), which was filed in September 2009, was barred by the two-year statute of limitation imposed by OCGA § 9-3-29 (a), unless the limitation period was tolled. Thus, I agree with the majority's ultimate conclusion in Division 5 (a) that the case must be remanded to the trial court for a determination whether the running of the statute of limitation on the Association's counterclaim for injunctive relief against Properties Development was subject to tolling. See OCGA § 9-3-96 ("If the defendant or those under whom he claims are guilty of a fraud by which the plaintiff has been debarred or deterred from bringing an action, the period of limitation shall run only from the time of the plaintiff's discovery of the fraud.").[1]

Because this case involves covenant violations caused by a permanent fixture, the rule adopted in *Black Island* and applied in *Marino* for restrictive covenant violations caused by separate and distinct repetitive acts has no bearing on this

---

[1] I also agree with the majority's conclusion in Division 5 (b) that it is unclear whether RIRA, which is not a party to the restrictive covenants in question, is entitled to assert the statute of limitation found in OCGA § 9-3-29 (a) as a defense to the Association's claim for injunctive relief asserted against it. Hence, like the majority, I believe that remand is appropriate for the trial court to make a determination on this issue.

4

appeal. Nevertheless, despite the fact that neither case affects the outcome here, the majority would overrule them. The majority contends that those two cases erroneously apply a "continuing tort" or "continuing violation" theory to claims seeking the enforcement of restrictive covenants because that theory is allegedly inconsistent with the plain language of OCGA § 9-3-29 (c) and has only been applied in nuisance cases. I disagree with these contentions and believe that *Black Island* and *Marino* remain good law and should not be overruled.

As an initial matter, the language of OCGA § 9-3-29 (c) does not foreclose applying a continuing violation theory when restrictive covenants are violated by separate and distinct repetitive acts. While OCGA § 9-3-29 (c) provides that a right of action accrues immediately upon the violation of a restrictive covenant, the statute is silent as to when or if a new right of action can ever accrue based on the specific factual circumstances. Hence, determining when an action is time-barred under OCGA § 9-3-29 (c) is not a matter of simply applying the plain language of the statute.

Given that the statute itself does not address the issue, it was appropriate for this Court in *Black Island* to determine whether a continuing violation theory could be applied in restrictive covenant cases. The general rule is that the continuing

5

violation theory does not apply to cases involving only property damage. See *Corporation of Mercer Univ. v. Nat. Gypsum Co.*, 258 Ga. 365, 366 (2) (368 SE2d 732) (1988). But as the majority indicates, an exception to the rule applies in cases involving a continuing nuisance. See *Shaheen v. G&G Corp.*, 230 Ga. 646, 648 (2) (198 SE2d 853) (1973). An exception also applies in cases of continuing trespass. See *City of Chamblee v. Maxwell*, 264 Ga. 635, 636 (452 SE2d 488) (1994); *Savage v. E. R. Snell Contractor*, 295 Ga. App. 319, 325 (3) (a) (672 SE2d 1) (2008). Furthermore, application of the continuing violation theory has not been restricted to cases sounding in tort. See *Willis v. City of Atlanta*, 265 Ga. App. 640, 644-645 (2) (595 SE2d 339) (2004) (applying continuing violation theory to claim for back pay based on a municipal ordinance).[2]

---

[2] Statutes of limitation serve two purposes: "One is evidentiary – to reduce the error rate in legal proceedings by barring litigation over claims relating to the distant past. The other is repose – to give people the assurance that after a fixed time they can go about their business without fear of having their liberty or property taken through the legal process." *Taylor v. Meirick*, 712 F.2d 1112, 1119 (7th Cir. 1983). Neither purpose is undermined by the continuing violation theory. When the challenged violation is a continuing one, the evidence remains fresh, and "the staleness concern disappears." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 380 (102 SCt 1114, 71 LE2d 214) (1982). See *Taylor*, 712 F.2d at 1119. And any uncertainty that the defendant may have as to whether he will be sued will be confined to the limitations period running from the time the final act of the alleged unlawful course of conduct takes place. See *Taylor*, 712 F.2d at 1119.

In light of this case law, the question whether a continuing violation theory applies in actions to enforce a restrictive covenant is not black and white. And, in my view, an action to enforce a restrictive covenant running with the land is sufficiently analogous to a nuisance or trespass action to justify applying a continuing violation theory when the facts of the case support it. Other courts have reached a similar conclusion where, as here, the statute imposing the relevant limitations period is silent as to whether a continuing violation theory should apply. See *Winn-Dixie Stores v. Dolgencorp, LLC*, 746 F.3d 1008, 1043 (11th Cir. 2014) (under Florida law, the continuing tort doctrine applies "where restrictive covenants are violated by ongoing, separate acts"); *Barker v. Jeremiasen*, 676 P.2d 1259, 1261 (Colo. App.1984) (statute of limitation did not bar action because the defendants breeding and raising of horses on their property "resulted in repeated and successive breaches of the . . . protective covenants which continued until the date of trial"); *Vranesevich v. Pearl Craft*, 241 P.3d 250, 254 (Okla. Ct. App. 2010) (applying continuing tort theory to action to enforce restrictive covenant). Indeed, although outside the context of the statute of limitation, our Supreme Court has referred to a breach of a restrictive covenant as a "continuing breach" that did not occur "at a single point in time." *Prime Bank v. Galler*, 263 Ga. 286, 288 (2) (430 SE2d 735) (1993). See also *Bounds v. Coventry Green Homeowners' Assn.*, 268 Ga. App. 69, 73 (2) (601 SE2d 440)

7

(2004) ("The breach of a restrictive covenant, whether by the homeowner or the homeowners' association, is a continuing one[.]").  Accordingly, this Court reasonably and properly adopted the continuing violation theory for restrictive covenant actions in *Black Island* and applied it in *Marino*, and thus neither case should be overruled.[3]

Lastly, the principle of stare decisis counsels against overruling *Black Island* and *Marino*.  "As a general rule, American courts adhere to the principle of stare decisis, which directs the courts to stand by their prior decisions," and "the application of [that principle] is essential to the performance of a well-ordered system of jurisprudence." (Citations and punctuation omitted.)  *Smith v. State*, 295 Ga. 120, 121 (757 SE2d 865) (2014).

> Even those who regard stare decisis with something less than enthusiasm recognize that the principle has even greater weight where the precedent relates to interpretation of a statute. A reinterpretation of a statute after the General Assembly's implicit acceptance of the original interpretation would constitute a judicial usurpation of the legislative function.

---

[3] As the majority points out, in *Helmley*, 242 Ga. App. at 884 (2), this Court declined to apply a continuing violation theory in a restrictive covenant action and found that the action was time-barred.  But, as *Black Island* and *Marino* both indicate, *Helmley* is clearly distinguishable because it involved the violation of a restrictive covenant caused by a permanent fixture.  See *Marino*, 322 Ga. App. at 843 (1); *Black Island*, 263 Ga. App. at 561 (1) (b).

8

(Citation and punctuation omitted.) *Etkind v. Suarez*, 271 Ga. 352, 358 (5) (519 SE2d 210) (1999). *Black Island* construed OCGA § 9-3-29 (c) to permit the application of a continuing violation theory, and that construction of the statute has been in effect for over a decade, during which time the legislature has chosen not to amend the statute. Because homeowners and homeowners' associations have relied on that construction since that time and "we do not write on a clean slate, stare decisis compels that we follow and apply" *Black Island*, particularly where, as here, there is no compelling reason for overturning it. *Etkind*, 271 Ga. at 358 (5).

For these combined reasons, it is unnecessary to overrule *Black Island* and *Marino* because neither affects the outcome of the present case, which is based on a covenant violation caused by a permanent fixture. Moreover, both of those cases reasonably concluded that a continuing violation theory can apply in actions involving restrictive covenant violations caused by separate and distinct repetitive acts. Consequently, while I concur in the judgment of Division 5 of the majority's opinion, I disagree with the reasoning of that division, including the need to overrule any of our settled precedent.

9

I am authorized to state that Phipps, C.J., Ellington, P.J., Miller, and McFadden, JJ., join this special concurrence, and that Doyle, P.J., joins to the extent the special concurrence asserts that *Marino v. Clary Lakes Homeowners Assn.*, 322 Ga. App. 839 (747 SE2d 31) (2013), and *Black Island Homeowners Assn. v. Marra*, 263 Ga. App. 559 (588 SE2d 250) (2003), should not be overruled.

ON MOTION FOR RECONSIDERATION

A14A1307. S-D RIRA, LLC v. THE OUTBACK PROPERTY
        OWNERS' ASSOCIATION, INC.


S-D RIRA, LLC has filed a motion for reconsideration arguing, among other things, that this Court erred when we instructed the trial court to consider on remand whether the applicable statute of limitation was tolled for some period of time. Given the split in votes between the majority opinion and the special concurrence, however, the tolling issue will not be relevant on remand.[1]

---

[1] The Georgia Constitution provides that, "[i]n the event of an equal division of the Judges [of the Court of Appeals] when sitting as a body, the case shall be immediately transmitted to the Supreme Court." Ga. Const. of 1983, Art. VI, Sec. V, Par. V. Here, although the majority and the special concurrence received six votes each, the whole court agreed on all issues other than what rule should be applied to determine the running of the statute of limitation. The whole court further agreed, however, that factual questions existed as to when the statute began to run and whether it should be tolled for any period of time. Both the majority and the special concurrence, therefore, concluded that the statute of limitation issue should be remanded to the trial court. Thus, because there was no division as to how the case should be disposed of, the case was not subject to automatic transfer to the Supreme Court of Georgia under the equal division rule. See *Rodriguez v. State*, 295 Ga. 362, 364 (1) (761 SE2d 19) (2014) ("when the full bench of the Court of Appeals has considered every claim of error that might cause the judgment of the trial court to be set aside, and when the full bench is equally divided about whether that judgment must be set aside, there is an 'equal division'"); *Ford v. Uniroyal Goodrich Tire Co.,* 270 Ga. 730, 731, n. 4 (514 SE2d 201) (1999) (noting that no equal division exists where a majority of judges of the Court of Appeals find that the judgment of the trial court must be reversed upon *some* ground, even though the judges are equally split as to the grounds for reversal).

Division 5 of the majority opinion, which advocated overruling *Black Island Homeowners Assn. v. Marra*, 263 Ga. App. 559 (588 SE2d 250) (2003) and *Marino v. Clary Lakes Homeowners Assn.*, 322 Ga. App. 839 (747 SE2d 31) (2013), received only six votes. The continuing violation theory announced in *Black Island* and applied in *Marino*, therefore, remains good law. See OCGA § 15-3-1 (d) (the overruling of any previous decision of the Court requires "the concurrence of a majority"). Additionally, although the special concurrence received six votes, one judge joined the special concurrence only to the extent that the special concurrence found that *Black Island* and *Marino* should not be overruled. Thus, there were only five votes for the proposition that under the continuing violation theory the use of a road is the equivalent of a property owner erecting a fixture.

Given that the covenant violation which the Association seeks to enjoin is the use of the Lot 10 road to access adjoining property, then under *Black Island* and *Marino* a violation of the covenants occurs, and the statute of limitation begins to run anew, every time an adjoining property owner utilizes the Lot 10 road for the purpose of accessing his property. See *Marino*, 322 Ga. App. at 843-844 (1) (holding that "each act of the homeowners parking their vehicles on their property other than in their garage, which was being used for storage, was a separate and distinct act that

2

gave rise to a new cause of action for an alleged violation of the" covenant that prohibited such conduct); *Black Island,* 263 Ga. App. at 561 (1) (b) (each instance of the property owner's mowing his undeveloped property in violation of a restrictive covenant was a "distinct, separate act that constitutes an alleged breach each time it occurs"). Accordingly, the trial court need not consider on remand the issue of tolling.

The motion for reconsideration is denied.